IN THE UNITED STATES BANKRUPTCY COURT
FOR THE
SOUTHERN DISTRICT OF GEORGIA

Brunswick Division

**FILED**
**Lucinda B. Rauback, Clerk**
**United States Bankruptcy Court**
**Brunswick, Georgia**
**By jbergen at 4:40 pm, Mar 28, 2014**

| | |
|---|---|
| IN RE: | ) |
| | ) |
| KIPP LESHONE TATE and | ) |
| CAROLYN TATE | ) |
| | ) |
| Debtors | ) |
| | ) |
| | ) |
| | ) |
| R. MICHAEL SOUTHER, TRUSTEE | ) |
| | ) |
| Movant | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| KIPP LESHONE TATE | ) |
| | ) |
| Debtor/Respondent | ) |
| | ) |

CHAPTER 7 CASE
NUMBER 12-20238

---

**OPINION AND ORDER FINDING RESPONDENT IN CONTEMPT**

This matter is before me on the Trustee's Motion for Order of Contempt and Sanctions ("Contempt Motion"). (ECF No. 62.)[1] The Contempt Motion requests the Court find debtor Kipp Leshone Tate in willful contempt for his failure to comply with the turnover order of September 12, 2013 ("Turnover Order"). (ECF No. 56.) The Contempt Motion seeks an order incarcerating Tate until he complies with the Turnover Order. (Contempt Mot., ECF No. 62 at 5.) A hearing was held on January 9, 2014, after which I took the matter under advisement. For the reasons that follow, the Contempt Motion is granted.

---

[1] References to the chapter 7 case docket appear in the following format: (ECF No. ____.)

AO 72A
(Rev. 8/82)

## FINDINGS OF FACT

Tate and his wife filed for chapter 7 bankruptcy relief on February 27, 2012. (Contempt Mot., ECF No. 62 ¶ 1.) Schedule B of the Tates' bankruptcy petition lists an "Arbitration Claim Pending vs. D.C. Metropolitan Dept." as property of the estate. (Sch. B of ECF No. 1, at 10.) The Tates' petition values the arbitration action at $280,000.00 and claims a $10,000 exemption in the property. (Contempt Mot., ECF No. 62 ¶ 3.) On July 12, 2012, the Tates received a standard chapter 7 discharge. (ECF No. 20.)

In January 2013, the attorney representing Tate's union notified the Trustee that the arbitration action had been decided in late November, 2012. (Contempt Mot., ECF No. 62 ¶ 6.) The decision reinstated Tate to his former position with the D.C. Metropolitan Police and awarded him full back pay and other benefits for the period from February 18, 2006, to April 20, 2013.[2] (Stipulations, Ex. A of ECF No. 76-1 at 2.) Although the November arbitration decision determined that Tate was entitled to payment for his claim, the amount due was to be calculated and disbursed at an undetermined later date. (See Contempt Mot., ECF No. 62 ¶¶ 6-7.) Both the union's attorney and the Trustee repeatedly notified Tate that any amount paid to him pursuant to the arbitration award was property of the bankruptcy estate and that he was to notify the Trustee once the amount of back pay he was to receive had been determined. (See Contempt Mot., ECF No. 62 ¶ 7.)

On June 25, 2013, Tate received a net payment of $171,534.61 from the arbitration award. (Stips., ECF No. 76 ¶ 4.) Of the amount awarded,

---

[2] Less a thirty-four day disciplinary suspension and other tax set-offs.

AO 72A
(Rev. 8/82)

the parties agree that $120,873.39-less Tate's $10,000.00 exemption-constitutes property of the Tates' chapter 7 bankruptcy estate. (Stips. ECF No. 76 ¶ 3.) The remaining $50,661.22 represents postpetition earnings and benefits and therefore is not subject to turnover. (Id.)

On August 19, 2013, the Trustee emailed the union's attorney for a status update. (Contempt Mot., ECF No. 62 ¶ 8.) The next day, Tate called the Trustee's office to inform the Trustee that he had received a net payment from the arbitration award of approximately $170,000.00 in late June. (Id.) Tate explained that he had already spent most of the award money on living expenses and repaying personal loans, but still had roughly $80,000.00 left. (Id.) The Trustee's office informed Tate the money awarded to him was property of the estate and requested Tate turn over the remaining funds immediately. (Mot. to Compel Turnover, ECF No. 51 ¶ 10.) Tate refused to do so, but indicated that he was willing to negotiate a settlement regarding the amount that needed to be turned over. (Id.)

The next day, on August 21, the Trustee filed a "Motion to Compel Turnover of Property of the Bankruptcy Estate." (Contempt Mot., ECF No. 62 ¶ 9.) Following a hearing on September 12, 2013, I granted the Trustee's motion:

> **IT IS HEREBY ORDERED** that the Trustee's Motion to Compel Turnover of Property of the Bankruptcy Estate is hereby granted; that Debtor Kipp Tate is hereby **ORDERED** to immediately turnover to the Trustee all funds received pursuant to the arbitration award in his favor against the D.C. Metropolitan Police Department, less any claimed exemption; and, to provide Trustee with an accounting as to all funds received pursuant to such award, including but not limited to, disbursement from such funds.

(ECF No. 56.)

Shortly thereafter, Tate notified the Trustee that he had spent the remaining funds from the arbitration award and therefore would be unable to comply with the Turnover Order. On October 2, the Trustee filed the Contempt Motion requesting the court find Tate: "[i]n willful contempt for his failure to comply with this Court's Order dated September 12, 2013 (Doc #56), to order the incarceration of Tate until he complies with the aforesaid Order . . . ." (Contempt Mot., ECF No. 62 at 1.)

The first hearing on the Trustee's Contempt Motion was held on November 7, 2013. Tate was represented by counsel. As of the first hearing, Tate had turned over $19,583.00 to the Trustee. (Stips., ECF No. 76 ¶ 5.) Tate's counsel explained that Tate had "run into trouble" in acquiring his bank account records and requested more time to provide a full accounting and to subpoena the bank if necessary.

Tate also requested more time to secure financing on a 2007 Ford Explorer Sport Trac ("Vehicle") he had purchased with $15,507.94 of the arbitration award funds. (See Ex. C of ECF No. 76-2, at 13.) His goal was to turn over the value of the Vehicle in lieu of turning over the Vehicle itself. The Trustee did not object and I continued the matter to January 9, 2014. At the conclusion of the first hearing, I made it clear that I expected Tate to attend in person and to testify under oath as to how the arbitration award money had been disbursed.

Prior to the continued hearing, Tate submitted an incomplete accounting of how the arbitration award had been spent. (See Exs. of ECF Nos. 76-1, 76-2.) These financial records claim to account for $112,570.36 of the $171,534.61 awarded. (See id.)

Exhibit B is a statement of the Tates' bank accounts at Suntrust Bank. (Stips, ECF No. 76 ¶ 7a; Ex. B of ECF No. 76-1.) These bank records cover the two-month period between the day Tate received the arbitration award payment and August 21, 2013, the day after the Trustee's office informed Tate of his obligation to turn over the funds. (See Ex. B of ECF No. 76-1.)

On June 25, 2013, Tate deposited the $171,408.05 into two accounts at SunTrust Bank: $31,408.05 in "Solid Choice Banking" Account #xxx8597 and $140,000.00 in "Suntrust Advantage MMA" Account #xxx8589. (Stips, ECF No. 76 ¶ 6.)

On August 20, Account #xxx8589 contained $78,541.91. (Stips, ECF No. 76 ¶ 8.) On August 21, 2013, after the Trustee demanded Tate turn over all remaining money from arbitration award, Tate's wife withdrew everything from Account #xxx8589 and closed the account. (See Ex. C of ECF No. 76-2, at 14.) Of the amount withdrawn from Account #xxx8589, Tate turned over $19,583.00 to the Trustee at the November 7 hearing. (Stips, ECF No. 76 ¶ 5.) Tate did not submit an accounting for the remaining $58,958.91. (Trustee's Br., ECF No. 77 at 5.)

Exhibit C is a collection of $49,192.94 in checks written from the Suntrust Accounts. (Stips, ECF No. 76 ¶ 7b; Ex. C of ECF. No. 76-2.) Exhibit C does not account for $7,500 in checks cashed on July 5, 2013, from the Tates' "Everyday Checking" Account #xxx2678. (See Ex. B of ECF No. 76-1, at 8; Ex. C of ECF No. 76-2.) Moreover, Tate provides no explanation of the purposes for which any of the checks were written, leaving the court to guess and infer based on illegibly scrawled Memos. (See Ex. C of ECF No. 76-2.) While some of these Memos designate the

AO 72A
(Rev. 8/82)

amounts are somehow connected to loans, Tate provides no positive indication whether the checks were written to pay back prior debts or extended to the drawer as credit. (See Ex. C of ECF No. 76-2, at 2-5; id. at 14.) Exhibit C does not attempt to describe the relationship between the Tates and the check recipients, nor does it provide any of the contact information for the check recipients. (See id.)

Exhibit D is a document prepared by Mr. Tate showing how $26,795.00 in cash withdrawals was spent from July 2nd to August 21st, 2013. (Stips, ECF No. 76 ¶ 7c; Ex. D of ECF No. 76-2, at 16.) When compared with the other records, the credibility of Exhibit D is questionable. (See Ex. D of ECF No. 76-2, at 16.) For example, Exhibit D accounts for a cash withdrawal of $11,000.00 from Account #xxx8597 as having been spent at the "Maryland Live Casino" on July 5, 2013. (Ex. D of ECF No. 76-2, at 16.) On the same day, Exhibit B records an $11,000.00 deposit into Account #xxx2678. (Ex. B of ECF No. 76-1, at 8.) While it is possible that Tate broke even that day, it is highly unlikely. Inconsistencies such as this plague Tate's accounting and call into question his good faith efforts to comply with the court's Turnover Order.

At the continued hearing on January 9, it was clear Tate had made little progress toward compliance with the Turnover Order. (See Jan. 9, 2014 Hr'g Tr., ECF No. 83.) Tate claimed he had been unable to obtain financing for the Vehicle and was the process of making arrangements to turn over the car to the Trustee. (See Debtor's Br., ECF No. 78 at 1.) Despite his presence at the hearing, Tate explained that he needed to make special arrangements for the Vehicle to be delivered from his current

AO 72A
(Rev. 8/82)

residence in Baltimore, Maryland, to the Trustee's office in Brunswick, Georgia. (See Debtor's Br., ECF No. 78 at 1.)

More importantly, Tate had done nothing to account for what had happened to the arbitration award funds after August 21, 2013. (See Trustee's Br., ECF No. 77 at 5.) Tate failed to provide any receipts or other documentary evidence showing where and how the unaccounted for funds had been distributed. (Id.)

While many of the other problems with Tate's accounting may be attributed to oversight, such a glaring omission from the accounting is not so easily explained. (See generally, ECF Nos. 76-1, 76-2.)

The testimony Tate offered regarding the undocumented funds was not credible. (Hr'g Tr. at 4:24-15:02, ECF No. 83.) Tate testified that he had spent the entire $58,958.91 in cash while gambling at various casinos:

> **Q:** And is it your position that all that money of the 78,000 less the 19,000 and change, that money was spent between August 21st and the time of the last hearing in November?
> **A:** Yes.
>
> **Q:** And could you just explain to the Court what you spent that money on? Was it all cash transactions?
> **A:** Yes, it was all cash. I mean, daily living expenses and I have a lot of gambling where I spent the money.
>
> **Q:** And when you say gambling, where did you spend that money and approximately how much?
> **A:** I mean, it was over the course of time. First of all, they were threatening jail if I didn't have $170,000 so I thought I – you know, I've got a gambling problem so I thought I could go to the casinos and the horse tracks and try to raise some money, and I wasn't successful.
>
> **Q:** And approximately how much money would you say you spent at those gambling? Of the approximately $60,000 that was left over from that withdrawal after paying the Trustee, how much would you say went towards gambling?
> **A:** I estimate probably about $55,000.

AO 72A

(Rev. 8/82)

**Q:** And once you withdrew the money all of these expenditures were made in cash?
**A:** Yes.

**Q:** And at casinos and other gambling facilities?
**A:** Yes.

**Q:** And of the remaining amounts of money where did that money go of the money that was not spent on gambling?
**A:** Just daily living expenses. I had some car repairs at the time, rent.

**Q:** And is it true that you don't have physical records of that because all of these expenditures were in cash?
**A:** Yes, sir.

(Hr'g Tr. at 6:10-7:16, ECF No. 83.) Tate's testimony was unworthy of belief:

> The facts I have before me indicate to me that Mr. Tate's testimony is incredible. What comes to mind is an old saying, I may have been born at night but I wasn't born last night. . . . [A] general statement that he lived off the money and he gambled it away at various casinos and betting parlors is incredible, especially in light of the demand made by the Trustee that he turn over what funds remain and that we have clear evidence that $78,000 in cash was withdrawn the day after the Trustee contacted the Debtor to turn over what cash was left from the $171,000 awarded to him.

(Hr'g Tr. at 19:09-19:24, ECF No. 83.)

Based on the evidence presented, I found that Tate's continued failure to turn over or credibly account for the remaining $58,958.91 was a violation of the Turnover Order. (Id. at 20:12-21:04.) I took under advisement the issue of whether an order of conditional incarceration would be sufficient to coerce Tate into compliance. (Id.)

Following my explicit rejection of his testimony at the January hearing, Tate filed Exhibit E. (Ex. E of ECF No. 76-2, at 18; see Debtor's Br., ECF No. 78 at 2.) Exhibit E is a list of previously omitted cash

expenditures from August 15 to August 29, 2013. (Ex. E of ECF No. 76-2, at 18.)

### Exhibit E

| | | | |
|---|---|---|---|
| Sallie Mae | 8/15/2013 | $ | 5,400.00 |
| **August 21 Balance** | | | **$78,541.91** |
| Lottery | August | $ | 1,500.00 |
| Adult Entertainment | August | $ | 5,300.00 |
| (Keno, scratched tickets, Powerball etc) | | | |
| Maryland Live | 8/21/2013 | $ | 9,500.00 |
| Hollywood Casino at Charles Town Races | 8/22/2013 | $ | 7,500.00 |
| Trump Plaza Casino - Atlantic City | 8/24/2013 | $ | 4,000.00 |
| Caesars Casino - Atlantic City | 8/24/2013 | $ | 5,500.00 |
| Tropicana Casino - Atlantic City | 8/26/2013 | $ | 3,800.00 |
| Caesars Casino - Atlantic City | 8/26/2013 | $ | 3,200.00 |
| Trump Plaza - Atlantic City | 8/27/2013 | $ | 2,500.00 |
| Bally's Casino - Atlantic City | 8/27/2013 | $ | 2,500.00 |
| Harrah's Casino - Atlantic City | 8/27/2013 | $ | 4,400.00 |
| Maryland Live | 8/29/2013 | $ | 5,600.00 |
| Chapter 7 Case No. $19,583.00 | | $ | 19,583.00 |

(Ex. E of ECF No. 76-2, at 18.)

Exhibit E purports to account for the amounts lost gambling, but provides no documentation or other verifiable indication of its credibility. (See id.) Exhibit E effectively amounts to nothing more than a specific itemization of Tate's unbelievable testimony regarding the unaccounted for $58,958.91; it is, accordingly, entitled to the same evidentiary weight. (See id.; Hr'g Tr. at 6:10-7:16, ECF No. 83.)

## CONCLUSIONS OF LAW

Courts in the Eleventh Circuit apply a burden-shifting approach to civil contempt matters. See, e.g., Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.), 92 F.3d 1539, 1545 (11th Cir. 1996). The moving party bears the burden of establishing that the nonmoving party has violated a court order by clear and convincing evidence. See Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1296 (11th Cir. 2002). The clear and convincing evidence must establish that: "1) the allegedly violated order was valid and lawful; 2) the order was clear and unambiguous; and 3) the alleged violator had the ability to comply with the order." In re Jove Eng'g, Inc., 92 F.3d at 1545 (quoting Jordan v. Wilson, 851 F.2d 1290, 1292 n.2 (11th Cir. 1988)).

However, once a prima facie showing of a violation has been made, the burden of production shifts to the responding party, who may defend his failure on the grounds that compliance with the order was impossible. See Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc., 950 F.2d 1525, 1529 (11th Cir. 1992) (citing United States v. Rylander, 460 U.S. 752, 757 (1983) ("Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled, however, that in raising this defense, the defendant has a burden of production.")).

Although inapplicable here, a sufficient showing by the alleged contemnor shifts the burden back to moving party. See CFTC, 950 F.2d at 1529. The moving party then has the burden of proving ability to comply. See id.; Combs v. Ryan's Coal Co., 785 F.2d 970, 984 (11th Cir. 1986).

## The Trustee Has Established a Violation of the Turnover Order.

The evidence here clearly and convincingly establishes that Tate violated the Turnover Order. Despite the extensive factual record indicating otherwise, Tate argues that the Trustee failed to meet even his initial burden.

Tate first argues that the Trustee failed to demonstrate that Tate had the ability to pay when the Turnover Order was entered: "The Trustee has not presented evidence that Tate utilized funds subject to turnover after September 12, 2013, and there is evidence to suggest that all disbursements made from such funds occurred prior to that date." (Debtor's Br., ECF No. 78 at 3.) Since the Trustee has not provided proof positive that Tate was still in possession of arbitration award funds when the Turnover Order was entered, the court should accept Tate's evidence that he had spent the arbitration award and had no ability to pay. (See id.; Ex. E of ECF No. 76-2, at 18.) While Tate's squandering away the property of the estate might be addressed elsewhere in the Code, his actions were not in violation of a court order if they occurred prior to the entry of the Turnover Order. See In re Jove Eng'g, Inc., 92 F.3d at 1558 ("When a contempt involves the prior conduct of an isolated, prohibited act, the resulting sanction has no coercive effect.").

This argument is without merit.

First, the record clearly establishes that after speaking with the Trustee on August 20, Tate withdrew $78,541.91 from his bank account, and on November 7, 2013, turned over only 19,583.00. (See generally, ECF No. 76.) This fact alone is sufficient to support the inference that Tate was in possession of the unaccounted for funds when the Turnover Order was

entered. See Maggio v. Zeitz, 333 U.S. 56, 65 (1948) (proof of past possession does not create a presumption of present possession "unless the time element and other factors make that a fair and reasonable inference.").

Furthermore, Tate admitted he was still in possession of funds from the arbitration award when the Turnover Order was entered on September 12:

> **Q:** And once the Trustee filed the motion for contempt which contained the request for incarceration, at that point in time the money you spent then you were trying to get back more money so you could pay over the whole amount, is that --
> **A:** That is what I was trying to do.
>
> **Q:** And at the end of it you turned over everything you had to the Trustee in November?
> **A:** Yes.

(Hr'g Tr. at 14:20-15:02, ECF No. 83.) Since Tate's gambling spree began with the hope of avoiding the Trustee's threatened incarceration, his substantial gambling losses must have occurred after the Contempt Motion was filed on October 2, 2013. (See ECF No. 62.)

Presumably, the "evidence to suggest all disbursements occurred prior to [the September 12 Turnover Order]" is found in Exhibit E, (See Debtor's Br., ECF No. 78 at 3) the list of Tate's undocumented gambling losses submitted after the January hearing. Exhibit E is consistent with Tate's testimony to the extent it describes the amount of money Tate lost and how he lost it. (See Ex. E of ECF No. 76-2, at 18; Hr'g Tr., ECF No. 83.)

However, Exhibit E specifically contradicts Tate's testimony regarding the time period over which he lost the unaccounted-for $58,958.91. (See Ex. E of ECF No. 76-2, at 18; Hr'g Tr. at 6:10-6:24, ECF

AO 72A
(Rev. 8/82)

No. 83.) Tate testified to gambling away the money after the Trustee filed the Contempt Motion on October 2, 2013. (See id.) Whereas, the list of gambling losses itemized in Exhibit E begins and ends roughly two weeks before the Turnover Order was entered and a full month before the Trustee filed the Contempt Motion. (Compare ECF Nos. 56, 62 with Ex. E of ECF No. 76-2, at 18.) The submission of Exhibit E into evidence does nothing to bolster the version of the facts proposed in Tate's brief; rather, the inconsistent accounts of when Tate squandered the arbitration award only further diminishes his credibility.

Tate also contends that the Trustee failed to establish a violation of the accounting provision of the Turnover Order. Since the Turnover Order "does not unambiguously describe the specific requirements of such accounting," Tate's informal accounting satisfies the Turnover Order. (See Debtor's Br., ECF No. 78 at 3.)

Tate is correct in one regard; any ambiguities in a court's order should be interpreted to the benefit of the party charged with contempt. See Ga. Power Co. v. NLRB, 484 F.3d 1288, 1291 (11th Cir. 2007). The Turnover Order did not specify a particular accounting method, so any reasonable method of accounting would have been satisfactory. However, "[i]n determining whether a party is in contempt of a court order, the order is subject to reasonable interpretation." Riccard, 307 F.3d at 1296. While the informal method may have been acceptable, the Turnover Order cannot be reasonably interpreted to allow an accounting which the court deems unworthy of belief. Thus, even if the court were to accept that Tate did not have the ability to pay on September 12, he still failed to comply with the Turnover Order because his informal accounting for

AO 72A

(Rev. 8/82)

$58,958.91 of the $78,541.91 withdrawn from SunTrust Acct. #xxx8589 was not credible.

## Tate Failed to Establish that Compliance Was Impossible

In order to succeed on the impossibility defense, the respondent must go "beyond a mere assertion of inability and establish that he has made in good faith all reasonable efforts to meet the terms of the court order he is seeking to avoid." CFTC, 950 F. 2d at 1529 (internal quotations omitted). The Eleventh Circuit strictly construes the "all reasonable efforts" requirement of the impossibility defense; substantial, diligent, and good faith efforts are not sufficient to rebut a prima facie showing of noncompliance. See Lawrence v. Goldberg (In re Lawrence), 279 F.3d 1294, 1297 (11th Cir. 2002); United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988); United States v. Hayes, 722 F.2d 723, 725 (11th Cir. 1984) (holding district court abused its discretion when it held an alleged contemnor showing "some effort" to comply with court order was sufficient to rebut moving party's prima facie case).

Here, Tate has not produced evidence that he made "in good faith, all reasonable efforts" to comply with the Turnover Order. See CFTC, 950 F.2d at 1529-30.

First, Tate's accounting of the arbitration award was incomplete and inconsistent. See id. at 1530 (contemnor's failure to produce any evidence regarding the whereabouts of half the money subject to the court's order was reason by itself to uphold district court's contempt finding); Roberts, 858 F.2d at 701 (evasive and incomplete testimony will not satisfy nonmoving party's burden of production); Combs, 785 F.2d at

AO 72A
(Rev. 8/82)

984 (finding production of incomplete financial records insufficient to prove alleged contemnor made "all reasonable efforts" to comply with order). Moreover, much of the accounting Tate did provide was dubious and unverifiable. (See Exs. C-E of ECF No. 76-2.) Exhibit B included transactions not accounted for in the other financial records. (See Ex. B of ECF No. 76-1, at 8-10.) Exhibit C omitted information essential to the Trustee's recovery efforts. (See Ex. C of ECF No. 76-2.) Exhibits D and E, although acceptable in form, were both unworthy of belief. (See ECF No. 76-2.) Taken together, the incomplete and inconsistent accounting not only fails to establish Tate's good faith efforts to account for the arbitration award, but positively indicates a bad faith attempt to defy the Turnover Order.

Second, Tate's testimony regarding the unaccounted-for funds lacked credibility. See CFTC, 950 F.2d at 1530. Specifically, I found it particularly unworthy of belief that Tate had withdrawn $78,541.91 in cash, lived off the money for two months without creating any kind of verifiable record, then lost $58,958.91 while gambling. (Hr'g Tr. at 19:09-20:19, ECF No. 83); see Roberts, 858 F.2d at 701 ("The presumption of continuing possession is not overcome by the alleged contemnor's own denials which the court finds incredible in context.") (internal quotation omitted).

Finally, Tate did not produce evidence that he had explored and exhausted all methods at his disposal, other than gambling, to raise funds. For example, Tate has yet to actually surrender possession of the Vehicle to the Trustee. Likewise, Tate did not provide evidence that he had attempted to recover the portion of the funds supposedly loaned to

AO 72A
(Rev. 8/82)

friends and relatives. See In re Lawrence, 279 F.3d at 1298 (discussing CFTC, 950 F.2d at 1530); see also Hayes, 722 F.2d at 725-26 (contemnor ordered to produce financial records did not make all reasonable efforts "merely by adducing evidence that he *requested* the documents (even diligent requests involving trips to Switzerland), when it appears that he [had] greater leverage at his disposal.").

Under the Eleventh Circuit's exacting standard, Tate's evidence of impossibility was no more than "a mere assertion of present inability." See Combs, 785 F.2d 983-84. Tate failed to satisfy his burden of production; accordingly, the impossibility defense is not available to him. See CFTC, 950 F.2d at 1530.

## Bankruptcy Courts Have the Power to Sanction Contempt.

Bankruptcy courts have both the inherent and statutory power to impose civil contempt sanctions to coerce compliance with lawful orders. See In re Lawrence, 279 F.3d at 1297; Hardy v. United States ex rel. IRS (In re Hardy), 97 F.3d 1384, 1389-90 (11th Cir. 1996).

All courts, whether established under Article I or Article III, have the inherent power to enforce compliance with their lawful orders by imposing sanctions for contempt.[3] See Chambers v. NASCO, Inc., 501 U.S.

---

[3] The inherent powers of federal courts include:

> the power of a federal court to control admission to its bar, punish parties for contempt, vacate its own judgment upon proof that a fraud has been perpetrated upon the court, bar a disruptive criminal defendant from the court room, dismiss an action on grounds of forum non conveniens, act sua sponte to dismiss a suit for failure to prosecute, and assess attorney's fees against counsel.

In re Jove Eng'g, Inc., 92 F.3d at 1553 n.13 (citing In re Mroz, 65 F.3d at 1575) (internal citations omitted).

32, 43 (1991). "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" <u>Id.</u> at 43 (quoting <u>Link v. Wabash R. Co.</u>, 370 U.S. 626, 630 (1962)). However, a court may exercise its inherent contempt power only to address bad faith "conduct which abuses the judicial process." <u>See In re Jove Eng'g, Inc.</u>, 92 F.3d at 1554 (quoting <u>Chambers</u>, 501 U.S. at 44-45); <u>see also Glatter v. Mroz (In re Mroz)</u>, 65 F.3d 1567, 1575 (11th Cir. 1995) ("Invocation of a court's inherent power requires a finding of bad faith.").

The statutory power of bankruptcy courts to sanction contempt is not so limited. <u>See In re Hardy</u>, 97 F.3d at 1389-90. Section 105 of the Bankruptcy Code grants bankruptcy courts with statutory authority to "issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C.A. § 105(a). The Eleventh Circuit reads these statutory powers broadly: "The language of § 105 encompasses 'any type of order, whether injunctive, compensatory or punitive,' as long as it is 'necessary or appropriate to carry out the provisions of' the Bankruptcy Code." <u>In re Hardy</u>, 97 F.3d at 1389 (quoting <u>In re Jove Eng'g, Inc.</u>, 92 F.3d at 1553-54); <u>see Alderwoods Grp., Inc. v. Garcia</u>, 682 F.3d 958, 966-67 (11th Cir. 2012) ("In addition to the traditional sanctions for coercing compliance with an injunction— incarceration or financial penalty, . . . a bankruptcy court may issue orders to obviate conduct that stands to frustrate administration of the Bankruptcy Code . . .") (internal citations omitted.)

AO 72A
(Rev. 8/82)

## The Bankruptcy Court's Sanctioning Power Under 11 U.S.C. § 105(a) is Limited to Civil Contempt.

Although § 105 grants bankruptcy courts broad powers to enforce their orders, this authority is limited to actions necessary and appropriate for carrying out the provisions of the Code. See Law v. Siegel, No. 12-5196, 571 U.S. ___, ___, 2014 WL 813702 at *1, *8 (U.S. Mar. 4, 2014) ("[B]ut whatever other sanctions a bankruptcy court may impose on a dishonest debtor, it may not contravene express provisions of the Bankruptcy Code. . . .").

Many courts interpret § 105 to grant bankruptcy courts the power to sanction civil, but not criminal, contempt. See In re Hardy, 97 F.3d at 1389. These courts find that criminal contempt sanctions are not "necessary and appropriate" to carry out the provisions of the Bankruptcy Code. See In re Hardy, 97 F.3d at 1389; but see In re WVF Acquisition, LLC, 420 B.R. 902, 914 (Bankr. S.D. Fla. 2009) (quoting Walton v. Countrywide Home Loans, Inc., No. 08-23337, 2009 WL 1905035, at *8 (S.D. Fla. June 9, 2009)) ("So long as the criminal contempt sanction is necessary or appropriate, a bankruptcy court has the statutory power to impose criminal sanctions.").

Whether a contempt proceeding is civil or criminal is determined by the purpose of the proposed sanctions. See In re Jove Eng'g, Inc., 92 F.2d at 1557-58. The purpose of civil contempt sanctions is to "(1) compensate the complainant for losses and expenses it incurred because of the contemptuous act, and (2) coerce the contemnor into complying with the court order." Id. at 1557. In contrast, sanctions for criminal contempt are "punitive in nature and are imposed to vindicate the

authority of the court." Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 423 (1986).

The test to determine whether a sanction for contempt is coercive and not punitive has been said to be "(1) whether the award directly serves the complainant rather than the public interest, and (2) whether the contemnor may control the extent of the award." In re Hardy, 97 F.3d at 1390. Thus, a sanction is punitive if it is defined by the court and may not be purged through any action of the contemnor. See In re Jove Eng'g, Inc., 92 F.3d at 1559.

### Bankruptcy Courts Have the Authority to Incarcerate Contemnors for Civil Contempt.

The distinction between civil and criminal contempt is particularly important because "[c]riminal contempt is a crime in every fundamental respect." Bloom v. Ill., 391 U.S. 194, 201 (1968). Therefore, an order of punitive sanctions necessarily implicates the contemnor's criminal due process rights and the added procedural protections afforded under the Constitution. See Turner v. Rogers, 131 S. Ct. 2507, 2518 (2011).

In International Union, United Mine Workers of America v. Bagwell, the Supreme Court made clear that an appropriately fashioned order of conditional incarceration for civil contempt will not implicate a contemnor's criminal due process rights:

> **The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command** such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance. Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of earlier release if he complies. **In these circumstances, the contemnor is able to purge the contempt and**

> **obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket.**
> By contrast, a fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a completed act of disobedience, such that the contemnor cannot avoid or abbreviate the confinement through later compliance. . . . When a contempt involves the prior conduct of an isolated, prohibited act, the resulting sanction has no coercive effect. The defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. . . .
> . . . **Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge. Thus, a flat, unconditional fine totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance.**
> A close analogy to coercive imprisonment is a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order. Like civil imprisonment, such fines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged.

512 U.S. 821, 827–829 (1994) (emphasis added) (internal quotations omitted).

Thus, a bankruptcy court may validly exercise its civil contempt power to order coercive incarceration sanctions if three conditions are satisfied.

First, the contemnor must always have ability to purge the contempt through compliance. See <u>Hicks ex rel. Feiock v. Feiock</u>, 485 U.S. 624, 649 (1988) (finding respondent "carries something even better than the 'keys to the prison' in his own pocket: as long as he meets the conditions of his informal probation, he will never enter the jail."); <u>Shillitani v. United States</u>, 384 U.S. 364, 370 n.6 (1966) (finding a fixed two year sentence which included a purge clause was a civil contempt sanction); <u>In re Lawrence</u>, 279 F.3d at 1300 (affirming bankruptcy court's order of imprisonment to coerce compliance with its turnover order when settlor of offshore asset protection trust retained de facto control over the trust

and therefore held the keys to his prison in his pocket). Coercive sanctions are thus not available "when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." Hicks, 485 U.S. at 638 n.9.

Second, civil contempt sanctions imposed to coerce compliance with a court order "'cannot be any greater than necessary to ensure such compliance' and may not be so excessive as to be punitive in nature." In re Jove Eng'g, Inc., 92 F.3d at 1558 (quoting Citronelle-Mobile Gathering, Inc. v. Watkins, 943 F.2d 1297, 1304 (11th Cir. 1991)). This is a fine line to walk. Coercive incarceration is the most severe sanction available to bankruptcy courts; it therefore poses the highest risk of becoming punitive. See In re Duggan, 133 B.R. 671, 671-74 (Bankr. D. Mass. 1991). To mitigate this risk, incarceration sanctions should be ordered only after less severe alternatives have failed or have been deemed doomed to fail.

Finally, the contemnor's incarceration must remain coercive: "[W]hen civil contempt sanctions lose their coercive effect, they become punitive and violate the contemnor's due process rights." CFTC, 950 F.2d at 1530; see Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 442 (1911). The Eleventh Circuit has upheld an order of incarceration, but cautioned "although incarceration for civil contempt may continue indefinitely, it cannot last forever." In re Lawrence, 279 F.3d at 1300 (quoting United States v. O.C. Jenkins, 760 F.2d 736, 740 (7th Cir. 1985)). Thus, a court ordering indefinite incarceration to enforce compliance must reconsider the incarceration at reasonable intervals to determine whether there remains a realistic possibility the contemnor will yield to the coercive

AO 72A
(Rev. 8/82)

effect of the sanction. See In re Lawrence, 279 F.3d at 1301 ("If the bankruptcy judge determines that, although Lawrence has the ability to turnover the Trust res, he will steadfastly refuse to do so, the judge will be obligated to release Lawrence because the subject incarceration would no longer serve the civil purpose of coercion.")

### Tate Will Be Incarcerated Only If Less Coercive Sanctions Fail.

The decision whether to impose sanctions is within the sound discretion of the trial court. See United States v. United Mine Workers of Am., 330 U.S. 258, 303 (1947). After reviewing the record in this matter, it is clear that Tate's violation of the Turnover Order is contemptuous. His behavior has also demonstrated that he will not comply with the Turnover Order if not forced to do so.

However, in fashioning coercive sanctions, the court "must consider the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction bringing about the result desired." Granfinanciera, S.A. v. Nordberg (In re Chase & Sanborn Corp.), 872 F.2d 397, 401 (11th Cir. 1989) (quoting United Mine Workers, 330 U.S. at 701).

Other courts considering these factors have concluded that coercive incarceration should be ordered when the contemnor has an established history of noncompliance and the circumstances indicate less severe sanctions would lack the force necessary to coerce compliance. See Bailey v. Hako-Med USA, Inc. (In re Bailey), No. 07-41381, A.P. No. 09-4002, 2011 WL 7702799 at *1, *7-*9 (Bankr. S.D. Ga. July 29, 2011) (recommending incarceration when the respondent's contemptuous behavior rendered it

AO 72A
(Rev. 8/82)

impossible to determine both the amount of monetary sanctions necessary to coerce compliance and the amount that would be so excessive as to be punitive).

The bankruptcy court for the District of Massachusetts, imposed conditional incarceration to coerce a resistant debtor's compliance with its turnover order. See In re Duggan 133 B.R. at 671-74. The debtor's claim of exemptions had already been denied under § 522(d) and his discharge had already been revoked under § 727 for concealing the assets subject to the turnover order. See id. Incarceration was appropriate as there was "no reason to expect that the Debtor would comply with a monetary judgment any more readily than he has complied with the order which is the subject of the present motion." Id. at 672-73.

Similarly, the District Court of the Middle District of Georgia upheld the bankruptcy court's order of coercive incarceration after the debtor's principal: 1) moved most of the debtor's collateral to an undisclosed location in anticipation of a secured creditor's successful motion for relief from the automatic stay; 2) refused to allow a secured creditor to inspect its collateral in violation of the consent order authorizing the debtor's use of cash collateral; 3) refused to account for the collateral when ordered to do so by the court; and 4) failed to appear at a hearing regarding the collateral when ordered to do so by the court. See Commercial Banking Co. v. Jones (In re Maxair Aircraft Corp. of Ga., Inc.), 148 B.R. 353, 356 (M.D. Ga. 1992). Essential to the District Court's decision was the contemnor's repeated disregard for the bankruptcy court's orders: "[The contemnor] has a history of not cooperating with the bankruptcy court's orders. Therefore, it is unlikely that he would

comply with a sanction like monetary compensation. Incarceration is the only alternative for someone who requires strong coercive tactics." Id. at 359.

These cases demonstrate that coercive imprisonment is and should be the last resort. Even when validly exercised, a sanction of incarceration for civil contempt smacks of debtors' prison. More importantly, the vague distinction between civil and criminal contempt encourages caution and reluctance when considering an incarceration sanction. See Int'l Union v. Bagwell, 512 U.S. at 828 ("Most contempt sanctions, like most criminal punishments, to some extent punish a prior offense as well as coerce an offender's future obedience."); see also id. at 828 n.3 (acknowledging "[n]umerous scholars have criticized as unworkable the traditional distinction between civil and criminal contempt"); In re Lawrence, 279 F.3d at 1300 (cautioning lower courts that when civil contempt sanctions lose their coercive effect, they become punitive and violate the contemnor's due process rights).

Since the decision regarding Tate's impossibility defense is a finding of fact reviewed under the clearly erroneous standard, and is therefore difficult to reverse on appeal, I am particularly concerned that an incarceration sanction poses an increased risk of becoming punitive. See CFTC, 950 F.2d at 1528; Combs, 785 F.2d at 984 ("It may be that Simmons and Alan's in fact lack the present ability to pay the obligation of Ryan's. But their failure to make all reasonable efforts to demonstrate that fact for the court means they were properly held in contempt.") While considering whether an indigent defendant has a right

to counsel in civil contempt proceedings threatening incarceration, the Supreme Court recently noted:

> Given the importance of the interest at stake, it is obviously important to assure accurate decision making in respect to the key 'ability to pay' question. Moreover, the fact that ability to comply marks a dividing line between civil and criminal contempt reinforces the need for accuracy. That is because an incorrect decision (wrongly classifying the contempt proceeding as civil) can increase the risk of wrongful incarceration by depriving the defendant of the procedural protections (including counsel) that the Constitution would demand in a criminal proceeding.

Turner v. Rogers, 131 S. Ct. at 2518 (internal citations omitted).

In light of these considerations, Tate will be incarcerated only after less severe measures have failed to coerce his compliance. Incarceration would be inappropriate if daily fines and the threat of incarceration are sufficient. Accordingly, I will enter an order of incarceration, but delay its implementation for twenty-eight days to allow Tate the opportunity to purge his contempt or to appeal the order.

Tate will be fined $100.00 per day until he has complied with the Turnover Order. After twenty-eight days, the court will hold a continued hearing on contempt to determine if Tate has purged his contempt through compliance. At the continued hearing, Tate may also provide additional evidence of having made "in good faith, all reasonable efforts to comply" sufficient to satisfy the requirements Eleventh Circuit's impossibility defense. See CFTC, 950 F.2d at 1529-30; Combs, 784 F.2d at 984.

If the court finds Tate has not complied with the Turnover Order despite his present ability to do so, he will be taken into custody by the United States Marshal Service and incarcerated indefinitely until purges his contempt. Tate completely controls the extent to which this

sanction applies; he has the power to avoid both the fines and imprisonment by his timely compliance.


**ORDER**

Based on the foregoing Findings of Fact and Conclusions of Law, Tate is in in civil contempt for his failure to comply with the specific and definite provisions of the September 12, 2013, Turnover Order. **IT IS THEREFORE ORDERED** that:

A. Tate is **ORDERED** to pay $100.00 per day starting April 1, 2014, and continuing for each day until the day he purges his contempt by:

    a. Credibly accounting for the undocumented cash expenditures submitted to the court as Exhibits D and E;

    b. Turning over or credibly accounting for the $58,958.91;

    c. Turning over the Vehicle by delivering its possession to the chapter 7 Trustee;

    d. Providing the Trustee with all information reasonably necessary to recover the amounts transferred after Tate received the $171,534.61 in June, 2013, by itemizing the names and addresses of all transferees, the amount transferred, and specifying the reason for the transfer; and

    e. Making all other efforts reasonably necessary to recover the property of the estate.

B. Tate is **FURTHER ORDERED** incarcerated until he complies, but, the court will allow Tate until April 30, 2014, either to appeal this order or to purge his contempt before implementing incarceration.

C. Notwithstanding the monetary fine, in the event that Tate fails to have purged his contempt at or before April 30, 2014, this court will conduct a continued hearing on contempt pursuant to 11 U.S.C. § 105(d) on April 30, 2014, at 10:00 am, to determine whether Tate has purged his contempt by complying with this Order and the Turnover Order. At the continued hearing, Tate may provide additional evidence of his inability to comply with the Turnover Order despite having made "in good faith, all reasonable efforts" to do so.

D. Tate is **FURTHER ORDERED** to appear at the April 30, 2014, continued hearing.

E. It is **FURTHER ORDERED** that if Tate does not purge his contempt by the time of the April 30, 2014 continued hearing, Tate will tender the sum of $2,800.00 to the court and will be ordered incarcerated until such time as he purges his contempt.

JOHN S. DALIS
United States Bankruptcy Judge

Dated at Brunswick, Georgia,
this 28 day of March, 2014.

AO 72A
(Rev. 8/82)