**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Brunswick, Georgia
*By jbergen at 1:21 pm, Oct 17, 2014*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE
SOUTHERN DISTRICT OF GEORGIA
Brunswick Division

| | |
|---|---|
| IN RE: | ) |
| | ) |
| KIPP LESHONE TATE and | )    CHAPTER 7 CASE |
| CAROLYN TATE | )    NUMBER <u>12-20238</u> |
| | ) |
|     Debtors | ) |
| _____ | ) |
| | ) |
| | ) |
| R. MICHAEL SOUTHER, TRUSTEE | ) |
| | ) |
|     Movant | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| KIPP LESHONE TATE | ) |
| | ) |
|     Debtor/Respondent | ) |

**OPINION AND ORDER FINDING RESPONDENT REMAINS IN CONTEMPT AND
<u>RENEWING REQUEST FOR ISSUANCE OF AN ARREST WARRANT</u>**

This matter is before me on remand from the United
States District Court for the Southern District of Georgia
("District Court") following Debtor Kipp Leshone Tate's appeal of
my Order of Civil Contempt and Application for the Issuance of an
Arrest Warrant dated April 30, 2014 ("Incarceration Order"). (ECF
No. 117.)[1] In the Incarceration Order, I ordered Tate incarcerated
until he complied with the terms of my civil contempt order

---

[1] References to the chapter 7 case docket appear in the following format: (ECF
No. ___.)

AO 72A

(Rev. 8/82)

("Contempt Order") dated March 28, 2014, which granted the Trustee's Motion for Contempt ("Contempt Motion") and found Tate in civil contempt for his failure to comply with my turnover order dated September 12, 2013 ("Turnover Order").

The District Court remanded the case for development of a more complete record. A hearing was held on September 11, 2014. I now issue this Opinion and Order finding that Tate remains in contempt and renewing my request to the District Court for the issuance of an arrest warrant.

## JURISDICTION

This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (E). Accordingly, this court has statutory authority to make a final ruling on the Contempt Motion. 28 U.S.C. § 1334.

Section 157(b)(2) provides a non-exclusive list of examples of core proceedings. The contempt proceedings here are core under 28 U.S.C. § 157(b)(2)(A)—"matters concerning the administration of the estate." See In re Minh Vu Hoang, No. 05-21078, 2014 WL 1320322, *1 (Bankr. D. Md. Mar. 28, 2014).

Tate's actions in this case directly interfere with the Trustee's ability to administer the estate and provide a distribution to creditors. The contempt proceedings here are to ensure the effective administration of the estate. See Alderwoods

Grp., Inc. v. Garcia, 682 F.3d 958, 969 (11th Cir. 2012)(bankruptcy court necessarily has power to enforce its own orders regarding administration of the estate).

Additionally, civil contempt proceedings arising out of core matters are themselves core matters. In re Skinner, 917 F.2d 444, 448 (10th Cir. 1990). When determining whether contempt proceedings are core or non-core, courts look to the underlying matter upon which the bankruptcy court was acting when sanctions were imposed. See In re Alpern, 191 B.R. 107, 111 (Bankr. N.D. Ill. 1995). An order to turn over property of the estate is a core proceeding under 28 U.S.C. § 157(b)(2)(E). The Trustee's motion for contempt and the proceedings that have followed, including this one, all arise out of the Turnover Motion and Order.

## BACKGROUND

Tate and his wife, Carolyn Davis Tate, filed for chapter 7 bankruptcy relief on February 27, 2012. (Contempt Mot., ECF No. 62 ¶ 1.) Schedule B of the Tates' bankruptcy petition lists an "Arbitration Claim Pending vs. D.C. Metropolitan Dept." as property of the estate. (Sch. B of ECF No. 1, at 10.) The Tates' petition values the arbitration action at $280,000.00 and claims a $10,000.00 exemption in the property. (Contempt Mot.,

AO 72A
(Rev. 8/82)

ECF No. 62 ¶ 3.) On July 12, 2012, the Tates received a standard chapter 7 discharge.[2] (ECF No. 20.)

In January 2013, the attorney representing Tate's union notified the Trustee that the arbitration action had been decided in late November, 2012. (Contempt Mot., ECF No. 62 ¶ 6.) The decision reinstated Tate to his former position with the D.C. Metropolitan Police and awarded him full back pay and other benefits for the period from February 18, 2006, to April 20, 2013. (Stipulations, Ex. A of ECF No. 76-1, at 2.) The November arbitration decision determined that Tate was entitled to payment for his claim, but the amount due was to be calculated and disbursed at an undetermined later date. (See Contempt Mot., ECF No. 62 ¶¶ 6-7.) Both the union's attorney and the Trustee repeatedly notified Tate that any amount paid to him under the terms of the arbitration award was property of the bankruptcy estate and that he was to notify the Trustee once the amount of back pay had been determined.[3] (Id. at ¶ 7.)

On June 25, 2013, Tate received a net payment of $171,534.61 from the arbitration award. (ECF No. 75 ¶ 4.) Of the

---

[2] The Tates' chapter 7 discharge was later revoked on May 1, 2014, pursuant to 11 U.S.C. § 727(d). (ECF No. 102.)

[3] Tate denies that he received a letter sent by the Trustee dated February 21, 2013, informing him that any arbitration award funds must be turned over. (Jan. 9, 2014 Hr'g Tr. at 8:13-10:06, ECF No. 83.) However, under oath, the attorney that initially represented Tate in his chapter 7 bankruptcy testified that he had informed Tate that in the event of a ruling in his favor, Tate would have to turn over any funds awarded, less a $10,000 exemption, to the Trustee. (Id. at 15:19-16:25)

AO 72A
(Rev. 8/82)

amount awarded, the parties agree that $120,873.39—less Tate's $10,000.00 exemption—constitutes property of the Tates' chapter 7 bankruptcy estate. (ECF No. 76 ¶ 3.) The remaining $50,661.22 represents postpetition earnings and benefits and therefore is not subject to turnover. (Id.)

The same day Tate received the payment, he deposited $171,408.05 into two accounts at SunTrust Bank ("SunTrust"): $31,408.05 in Account # xxx8597 and $140,000.00 in Account # xxx8589. (Stips., ECF No. 76 ¶ 6.)

On August 19, 2013, the Trustee emailed the union's attorney for a status update. (Contempt Mot., ECF No. 62 ¶ 8.) The next day, Tate called the Trustee's office to inform the Trustee that he had received a net payment from the arbitration award in late June. (Id.) Tate explained that he had already spent most of the award money on living expenses and repaying personal loans, but still had roughly $80,000.00 left. (Id.) The Trustee's office informed Tate that the money awarded to him as back pay was property of the estate and requested Tate turn over the remaining funds immediately. (Mot. to Compel Turnover, ECF No. 51 ¶ 10.) Tate refused to do so, but said he was willing to negotiate a settlement regarding the amount he would turn over. (Id.)

The next day, August 21, 2013, the Trustee filed a "Motion to Compel Turnover of Property of the Bankruptcy Estate."

(Contempt Mot., ECF No. 62 ¶ 9.) Following a hearing on September 12, 2013, I granted the Trustee's motion:

> **IT IS HEREBY ORDERED** that the Trustee's Motion to Compel Turnover of Property of the Bankruptcy Estate is hereby granted; that Debtor Kipp Tate is hereby **ORDERED** to immediately turnover to the Trustee all funds received pursuant to the arbitration award in his favor against the D.C. Metropolitan Police Department, less any claimed exemption; and, to provide Trustee with an accounting as to all funds received pursuant to such award, including but not limited to, disbursement from such funds.

(ECF No. 56.)

Shortly thereafter, Tate notified the Trustee that he had spent the remaining funds from the arbitration award and therefore would be unable to comply with the Turnover Order. On October 2, 2013, the Trustee filed a Motion for Order of Contempt and Sanctions ("Contempt Motion") requesting the court find Tate: "[i]n willful contempt for his failure to comply with this Court's Order dated September 12, 2013 (Doc #56), to order the incarceration of Tate until he complies with the aforesaid Order . . . ." (Contempt Mot., ECF No. 62.)

After two hearings on the Contempt Motion, I issued the Contempt Order on March 28, 2014, finding Tate in civil contempt for his failure to comply with the Turnover Order. (ECF No. 86, In re Tate, No. 12-20238, 2014 WL 1330567 (Bankr. S.D. Ga. Mar. 28, 2014).) The Contempt Order stated the requirements for Tate to purge his contempt. (ECF No. 86 at 26-27.) The Contempt Order

further ordered Tate incarcerated until he complies, but stayed implementing incarceration for twenty-eight days to allow him to purge his contempt or to file an appeal of the Contempt Order. (Id.) Finally, the Contempt Order required Tate appear at a continued hearing on contempt on April 30, 2014. (Id.)

Tate did not appeal the Contempt Order. (ECF No. 96 at 3.) At the call of the matter on April 30, 2014, Tate failed to appear as ordered. (Id.) After reviewing the requirements I set out in the Contempt Order, I determined that Tate had not taken substantial steps towards purging his contempt. (Id. at 4.) I also found that Tate's repeated disregard for the court's orders demonstrated that daily fines and the threat of imprisonment were not sufficiently coercive to force him into compliance. (Id.)

Immediately following the April 30, 2014 hearing I issued the Incarceration Order. (ECF No. 96.)

## FINDINGS OF FACT[4]

The Turnover Order requires that Tate "turnover to the Trustee all funds received pursuant to the arbitration award . . . less any claimed exemption; **and** . . . provide [the] Trustee with an accounting as to all funds received pursuant to such

---

[4] Tate's testimony throughout these hearings brings to mind a poignant quote:

> "Oh, what a tangled web we weave,
> When first we practice to deceive!"

Sir Walter Scott, Marmion, cto. 6, st. 17 (1808).

AO 72A
(Rev. 8/82)

award." (ECF No. 56) (emphasis added). Since the date of the Turnover Order, September 12, 2013, Tate has provided only dribbles of information concerning what he did with the arbitration award funds. (Contempt Hr'g Apr. 30, 2014, at 10:40:48). More importantly, Tate has frustrated the Trustee's attempts to determine what happened to $78,541.91 of the arbitration award funds which the Trustee has proven were in Tate's possession the day the Turnover Motion was filed on August 21, 2013 ("Undocumented Funds"). (See ECF No. 127 at 22.)

To date, Tate has turned over $19,583.00 of the Undocumented Funds. (Stips., ECF No. 76 ¶ 5.) He has failed to provide any real accounting of the Undocumented Funds. The accountings Tate has provided are contradictory and supported by nothing more than his testimony, which is not credible and clearly false.

Tate did not appear at the first hearing held on the Contempt Motion. Tate's counsel explained that Tate had "run into trouble" in acquiring his bank account records and requested more time to provide a full accounting and potentially subpoena the bank for records.

Tate also requested more time to secure financing on a 2007 Ford Explorer Sport Trac ("Vehicle") he had purchased with $15,507.94 of the arbitration award funds. (See Ex. C of ECF No. 76-2, at 13.) His goal was to turn over the value of the Vehicle

in lieu of turning over the Vehicle itself. The Trustee did not object and I continued the matter to January 9, 2014.

At the conclusion of the first hearing, I made it clear that I expected Tate to attend and to testify under oath as to how he had spent the arbitration award money.

Prior to the continued hearing, Tate submitted an incomplete accounting ("First Accounting"). (See Exs. of ECF Nos. 76-1, 76-2.) The First Accounting only accounts for the whereabouts of the funds prior to the Turnover Order. It does not account for the Undocumented Funds.

The First Accounting includes bank statements from the Tates' bank accounts at SunTrust. (See Ex. B of ECF No. 76-1.) These statements cover the two-month period between the day Tate received the arbitration award funds and the day after the Trustee's office informed Tate of his obligation to turn over the funds, August 21, 2013. The First Accounting shows that in addition to the two bank accounts in which the arbitration award funds were deposited—Account # xxx8597 and Account # xxx8589—the Tates have a third bank account with SunTrust: Account # xxx2678 (collectively "SunTrust Accounts"). (See id.)

The First Accounting also includes bank copies of $49,192.94 in checks drawn on the SunTrust Accounts between June 26, 2013, and August 15, 2013. (Stips., ECF No. 76 ¶ 7b; Ex. C of ECF No. 76-2.) The check copies do not include $7,500.00 in

AO 72A

(Rev. 8/82)

checks cashed on July 5, 2013, from Account # xxx2678, the third Account. (See Ex. B of ECF No. 76-1, at 8; Ex. C of ECF No. 76-2.)

Moreover, Tate provided no explanation of the purposes for which any of the checks were written, providing only illegibly scrawled Memos. (See Ex. C of ECF No. 76-2.) While some of these Memos designate that the amounts are somehow connected to loans, Tate provided nothing to establish whether the checks were written to pay back earlier debts or debts extended to the drawer as credit. (See id. at 2-5, 14.) The check copies do not describe the relationship between the Tates and the check recipients, nor do they provide any contact information for the check recipients. (See id.)

Finally, the Exhibit D of the First Accounting—a document Tate prepared—purports to show how $26,795.00 in cash withdrawals was spent from July 2 to August 21, 2013 ("Exhibit D"). (Stips., ECF No. 76 ¶ 7c; Ex. D of ECF No. 76-2, at 16.)

When compared with the other records, the credibility of Exhibit D is questionable. For example, Exhibit D accounts for a cash withdrawal of $11,000.00 from Account # xxx8597 as having been spent at the "Maryland Live Casino" on July 5, 2013. (Id.) On the same day, Tate's bank statements show an $11,000.00 deposit into Account # xxx2678. (Ex. B of ECF No. 76-1, at 8.) Such inconsistencies plague Tate's accounting and call into

question his good faith efforts to comply with the Turnover Order.

Tate appeared at the continued hearing on January 9, 2014. Nonetheless, it was clear he had made little progress toward compliance with the Turnover Order.

Tate informed the Court that he had been unable to obtain financing for the Vehicle and was in the process of making arrangements to turn over the Vehicle to the Trustee. Despite his presence at the hearing, Tate explained that he needed to make special arrangements for the Vehicle to be delivered from his current residence in Baltimore, Maryland, to the Trustee's office in Brunswick, Georgia.

More importantly, Tate provided nothing more than his testimony to account for the Undocumented Funds. Tate failed to provide any receipts or other documentary evidence showing where and how he had spent the portion of the Undocumented Funds he had not turned over to the Trustee.

The testimony Tate offered was not credible. Tate testified that he had spent the entire $58,958.91 in cash on "daily living expenses" and gambling at various casinos:

AO 72A
(Rev. 8/82)

**Q:** And is it your position that all that money of the 78,000 less the 19,000 and change, that money was spent between August 21st and the time of the last hearing in November?

**A:** Yes.

**Q:** And could you just explain to the Court what you spent that money on? Was it all cash transactions?

**A:** Yes, it was all cash. I mean, daily living expenses and I have a lot of gambling where I spent the money.

**Q:** And when you say gambling, where did you spend that money and approximately how much?

**A:** I mean, it was over the course of time. First of all, they were threatening jail if I didn't have $170,000 so I thought I - you know, I've got a gambling problem so I thought I could go to the casinos and the horse tracks and try to raise some money, and I wasn't successful.

**Q:** And approximately how much money would you say you spent at those gambling? Of the approximately $60,000 that was left over from that withdrawal after paying the Trustee, how much would you say went towards gambling?

**A:** I estimate probably about $55,000.

**Q:** And once you withdrew the money all of these expenditures were made in cash?

**A:** Yes.

**Q:** And at casinos and other gambling facilities?

**A:** Yes.

**Q:** And of the remaining amounts of money where did that money go of the money that was not spent on gambling?

**A:** Just daily living expenses. I had some car repairs at the time, rent.

**Q:** And is it true that you don't have physical records of that because all of these expenditures were in cash?

**A:** Yes, sir.

(Jan. 9, 2014 Hr'g Tr. at 6:10-7:16, ECF No. 83.) To say that Tate's testimony was unconvincing is an understatement:

> The facts I have before me indicate to me that Mr. Tate's testimony is incredible. What comes to mind is an old saying, I may have been born at night but I wasn't born last night. . . . [A] general statement that he lived off the money and he gambled it away at various casinos and betting parlors is incredible, especially in light of the demand made by the Trustee that he turn over what funds remain and that we have clear evidence that $78,000 in cash was withdrawn the day after the Trustee contacted the Debtor to turn over what cash was left from the $171,000 awarded to him.

(Id. at 19:09-19:24)

Following my explicit rejection of his testimony at the January hearing, Tate filed Exhibit E. (Ex. E of ECF No. 76-2, at 18; see Debtor's Br., ECF No. 78 at 2.) Exhibit E is a list of previously omitted cash expenditures from August 15 to August 29, 2013.

**Exhibit E**

| | | | |
|---|---|---|---|
| Sallie Mae | 8/15/2013 | $ | 5,400.00 |
| **August 21 Balance** | | | **$78,541.91** |
| Lottery | August | $ | 1,500.00 |
| Adult Entertainment | August | $ | 5,300.00 |
| (Keno, scratched tickets, Powerball etc) | | | |
| Maryland Live | 8/21/2013 | $ | 9,500.00 |
| Hollywood Casino at Charles Town Races | 8/22/2013 | $ | 7,500.00 |
| Trump Plaza Casino – Atlantic City | 8/24/2013 | $ | 4,000.00 |
| Caesars Casino – Atlantic City | 8/24/2013 | $ | 5,500.00 |
| Tropicana Casino – Atlantic City | 8/26/2013 | $ | 3,800.00 |
| Caesars Casino – Atlantic City | 8/26/2013 | $ | 3,200.00 |
| Trump Plaza – Atlantic City | 8/27/2013 | $ | 2,500.00 |
| Bally's Casino – Atlantic City | 8/27/2013 | $ | 2,500.00 |
| Harrah's Casino – Atlantic City | 8/27/2013 | $ | 4,400.00 |
| Maryland Live | 8/29/2013 | $ | 5,600.00 |
| Chapter 7 Case No. $19,583.00 | | $ | 19,583.00 |

(Ex. E of ECF No. 76-2, at 18.)

Exhibit E purports to account for the amounts lost gambling, but provides no documentation or other verifiable indication of its credibility. (See id.) Exhibit E effectively amounts to nothing more than a specific itemization of Tate's unbelievable testimony regarding the unaccounted-for $58,958.91. It is, accordingly, entitled to the same evidentiary weight.[5]

After the continued hearing, I issued the Contempt Order on March 28, 2014, finding Tate in civil contempt for his

---

[5] In fact, as will be later shown, Tate's entire testimony that he lost approximately $55,000.00 gambling between August 21, 2013, and August 29, 2013, was a lie.

AO 72A

(Rev. 8/82)

failure to comply with the Turnover Order. (ECF No. 86.) The Contempt Order provides:

A. Tate is **ORDERED** to pay $100.00 per day starting April 1, 2014, and continuing for each day until the day he purges his contempt by:

    a.    Credibly accounting for the undocumented cash expenditures submitted to the court as Exhibits D and E;

    b.    Turning over or credibly accounting for the $58,958.91;

    c.    Turning over the Vehicle by delivering its possession to the chapter 7 Trustee;

    d.    Providing the Trustee with all information reasonably necessary to recover the amounts transferred after receipt of $171,534.61 in June, 2013, by itemizing the names and addresses of all transferees, the amount transferred, and specifying the reason for the transfer; and,

    e.    Making all other efforts reasonably necessary to recover the property of the estate.

B. Tate is **FURTHER ORDERED** incarcerated until he complies, but, the court will allow Tate until April 30, 2014, either to appeal this order or to purge his contempt before implementing incarceration.

C. Notwithstanding the monetary fine, in the event that Tate fails to have purged his contempt at or before April 30, 2014, this court will conduct a continued hearing on contempt pursuant to 11 U.S.C. § 105(d) on April 30, 2014, at 10:00 am, to determine whether Tate has purged his contempt by complying with this Order and the Turnover Order. At the continued hearing, Tate may provide additional evidence of his inability to comply with the Turnover Order despite having made "in good faith, all reasonable efforts" to do so.

D. Tate is **FURTHER ORDERED** to appear at the April 30, 2014, continued hearing.

E.  It is **FURTHER ORDERED** that if Tate does not purge his
    contempt by the time of the April 30, 2014 continued
    hearing, Tate will tender the sum of $2,800.00 to the
    court and will be ordered incarcerated until such time
    as he purges his contempt.

(ECF No. 86 at 26-27.)

Tate failed to appear as ordered at the hearing held pursuant to the Contempt Order on April 30, 2014. He also failed to pay the $2,800.00 incurred as daily fines under Section A and Section E of the Contempt Order.

Instead, Tate provided through counsel yet another list of undocumented cash expenditures much like those I previously determined were non-compliant with the Turnover Order. (Hr'g Apr. 30, 2014 at 10:32:18.) This accounting listed approximately seven different casinos in the New Jersey area where Tate apparently did his gambling. (Id.) However, absent any indication of its credibility, I determined that this evidence did not satisfy the terms of subsections "a" or "b" of the Contempt Order.

At the time of the hearing Tate had turned over his Vehicle to the Trustee in satisfaction of subsection "c" of the Contempt Order.

Tate had also submitted to the Trustee some of the information required by subsection "d" of the Contempt Order, but did not list any of the amounts transferred and completely omitted information regarding some of the checks at issue. (Id.) Accordingly, I found that although the information provided would

AO 72A
(Rev. 8/82)

help the Trustee recover the money, Tate's efforts were incomplete and did not satisfy subsection "d".

Overall, I found that Tate had not taken substantial steps towards purging his contempt. Immediately following the April 30, 2014, hearing I issued the Incarceration Order. (ECF No. 96.)

On June 9, 2014, the Trustee received records from SunTrust in response to a subpoena ("Trustee's Bank Records"). (Ex. A of ECF No. 85-2.) The Trustee provided copies of these records to Tate and his attorney.

The Trustee's Bank Records show that eight official checks totaling $70,541.91 were drawn from Account # xxx8589 on August 21, 2013 when the account was closed ("Check #'s 1-8"). (ECF No. 127 at 3-18.)

Check #1 was written for $25,000.00 to the order of "Byron Hall" and lists "Kipp L. Tate" as the "Purchaser." (Id. at 3.) According to the records, Check #1, less $2,500.00 taken in cash, was deposited on the same day it was issued into a fourth SunTrust account.[6] (Id. at 5-6.) The Trustee did not have any information regarding the names listed on this account. (Id.)

Checks #'s 2-8 were written to the order of "Carolyn Davis" and list "Carolyn Davis" as the "Purchaser." (Id. at 7-

---

[6] Account # xxx8385

AO 72A

(Rev. 8/82)

18.) Carolyn Davis was Mrs. Tate's name prior to marrying Mr. Tate. (ECF No. 1 at 1.)

Check #6 was reissued on October 30, 2013, in the amount of $10,000.00 to the order of "R. Michael Souther, P.C.", the Trustee.[7] (ECF No. 127 at 15-16.)

The Trustee's Bank Records shows that the other checks were cashed as follows:

| Check | Amount | Date Cashed |
|---|---|---|
| Check #2 | $5,000.00 | September 30, 2013 |
| Check #3 | $5,000.00 | October 29, 2013 |
| Check #4 | $5,000.00 | December 5, 2013 |
| Check #5 | $5,000.00 | January 6, 2014 |
| Check #7 | $10,000.00 | November 6, 2013 |
| Check #8 | $5,541.91 | September 18, 2013 |

(Id. at 7-18.)

The Trustee's Bank Records do not account for $8,000.00 of the Undocumented Funds.

Following the remand from the District Court, a hearing was held September 11, 2014. At this hearing, Tate was no longer represented by counsel. (See ECF No. 123.)

At the outset of the hearing, the Trustee noted that Tate had approached him before the hearing and asked him to state on Tate's behalf that Tate would like to resolve the entire matter. (Remand Hr'g Sept. 11, 2014 at 1:18:47--1:19:36.) The

---

[7] The source of the remaining $9,583.00 that was turned over to the Trustee is not established. The Trustee did not have a copy of that check at hearing.

Trustee said Tate was willing to submit to a judgment for the amount of money he owes and voluntarily consent to a garnishment of his wages to the extent allowed under law. (Id.)

The Trustee then called Tate to testify. Tate acknowledged line by line that Exhibit E was the accounting he had previously given for the Undocumented Funds. (Id. at 1:38:08-1:43:12.) He then admitted that Exhibit E and his previous testimony were lies:

> **Trustee:** And [Exhibit E] is your representation of what happened to the $78,000?
>
> **Tate:** No, it's not.
>
> **Trustee:** Well, what is your representation?
>
> **Tate:** What happened to the $78,000 is basically what your records show . . . The money basically went to pay some people, and what was left you received. And I'll admit I did most of my gamblings prior to the $78,000 like I said before and I'm sorry to the court for not testifying to this earlier. It was incorrect.
>
> **Court:** So this is not true?
>
> **Tate:** I mean, I did gamble but the $78,000 basically this was prior to the $78,000, most of it. Most of the gambling.
>
> **Court:** So the dates are incorrect?
>
> **Tate:** The dates, correct.
>
> **Court:** They're not right?
>
> **Tate:** Yeah, we was estimating. I mean all of this was an estimation.

AO 72A

(Rev. 8/82)

(<u>Id.</u> at 1:43:25-1:44:36.) Tate then acknowledged that Check #'s 1-8 accurately represented the disposition of the funds that remained in Account # xxx8589 when it was closed on August 21, 2013. (<u>Id.</u> at 1:45:40-1:52:44).

Tate did not offer a credible accounting of how he or his wife spent the money after cashing the checks. In fact, aside from his new story that the money was given away or "lived" away, not gambled away, his testimony shed no light on what he actually did with the Undocumented Funds.

When asked about the purpose of the payment to Byron Hall, Tate responded, "I don't know. Just money that he's loaned me like . . . for the past seven or eight years since I've known him. Every time I got in a little bind, he would help me out." (<u>Id.</u> at 1:52:44-1:53:20.)

Further, Tate's testimony concerning the disposition of Check #'s 2-8 was inconsistent with the Trustee's Bank Records. Tate testified that the checks were cashed immediately after they were issued. (<u>See</u> <u>id.</u> at 1:54:10-1:56:28.) However, the Trustee's Bank Records establish that Checks #2 and #3 were cashed more than a month after they were issued. (ECF No. 127 at 7-12.) Additionally, Check #6 was reissued to the order of the Trustee more than a month after it was purchased. (<u>Id.</u> at 15-16.) This would not have been possible if it had been cashed at the same time it was issued, as Tate testified.

AO 72A

(Rev. 8/82)

Tate's testimony concerning who purchased the checks was also inconsistent. At one instance Tate stated that on August 21, 2013, he purchased the check written to Byron Hall for $25,000.00. (Hr'g Sept. 11, 2014 at 1:46:15-1:47:00.) Later, when asked directly who went to the bank on August 21, 2013, Tate stated that his wife went to the bank alone to withdraw the money. (Id. at 1:59:30-2:00:46.) The Trustees Bank Records establish that the final withdrawals from the account all occurred at the same time. (ECF No. 127 at 22.)

Finally, Tate's responses to how the money was spent were incredible. First, with the regard to Check #3:

> **Q:** Do you see the date at the top, October 29, 2013? That indicates the date the check was negotiated.
>
> **A:** Ok, I understand.
>
> **Q:** So, how did that happen? [October] 29th, [Mrs. Tate] went to the bank, signed the back of it and got $5,000 dollars?
>
> **A:** Yes.
>
> **Q:** And what'd she do with the money? Give it to you?
>
> **A:** Yes. Probably. I mean, paid some bills. Yes.

(Hr'g Sept. 11, 2014, at 1:57:00-1:57:33) Later, when asked about the same check, Tate said that he did not know what happened to the cash. (Id. at 2:15:30-2:17:00.)

Then, with regard to the money generally, when asked what the money was spent on, Tate responded, "Like I said sir, I

have rent, car payment, uh stuff, just daily living expenses."
(Id. at 1:58:18-1:58:25.)

I found Tate's testimony at the fourth hearing no more credible than his previous testimony:

> "See the problem I got again Mr. Tate? There is a real problem with your credibility. There was no mistake about your prior testimony as to where this money went. And only after the Trustee presented you with these checks did your story change . . . . The only reason in my view that you corrected the record today as to what happened to the money is because the Trustee caught you. He sent you copies of the checks . . . . And your story changed. I don't believe you. Based on the record in this case, no one could believe you that you have accounted for these funds. . . . What this court is about is affording the honest, sincere and unfortunate individual an opportunity for a fresh start . . . . You're none of them."

(Id. at 2:21:48-2:28:44.)

Accordingly, I find that Tate has failed to account for the Undocumented Funds. The Trustee's Bank Records provide some insight, but do not account for $8,000.00 of the Undocumented Funds. More importantly, they really only prove that Exhibit E was a false accounting. They do not provide any information on the current whereabouts of the money.

Six of the checks included in the Trustee's Bank Records were written to Tate's wife and cashed at a later date. The Turnover Order requires Tate to account for what happened to that cash. He has not done so.

Further, questions remain with regard to Tate's accounting of the only check written to the order of someone other than Tate's wife. That check was deposited into another SunTrust bank account. There is no evidence, other than Tate's testimony, that neither Tate nor his wife's name is on that account and no evidence of whether the funds remain in that account or were disbursed.

## CONCLUSIONS OF LAW

### I.

### Bankruptcy Courts Have Power to Sanction Civil Contempt.

Bankruptcy courts have both the inherent and statutory power to impose civil contempt sanctions to coerce compliance with lawful orders. See Lawrence v. Goldberg (In re Lawrence), 279 F.3d 1294, 1297 (11th Cir. 2002); Hardy v. United States ex rel. IRS (In re Hardy), 97 F.3d 1384, 1389-90 (11th Cir. 1996).

All courts, whether established under Article I or Article III, have the inherent power to enforce compliance with their lawful orders by imposing sanctions for contempt.[8] See

---

[8] The inherent powers of federal courts include:

> the power of a federal court to control admission to its bar, punish parties for contempt, vacate its own judgment upon proof that a fraud has been perpetrated upon the court, bar a disruptive criminal defendant from the court room, dismiss an action on grounds of forum non conveniens, act sua sponte to dismiss a suit for failure to prosecute, and assess attorney's fees against counsel.

Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991). "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Id. at 43 (quoting Link v. Wabash R. Co., 370 U.S. 626, 630 (1962)). However, a court may exercise its inherent contempt power only to address bad faith conduct which "abuses the judicial process." See Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.), 92 F.3d 1539, 1554 (11th Cir. 1996) (quoting Chambers, 501 U.S. at 44-45); see also Glatter v. Mroz (In re Mroz), 65 F.3d 1567, 1575 (11th Cir. 1995) ("Invocation of a court's inherent power requires a finding of bad faith.").

The statutory power of bankruptcy courts to sanction contempt is not so limited. See In re Hardy, 97 F.3d at 1389-90. Section 105 of the Bankruptcy Code grants bankruptcy courts statutory authority to "issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Eleventh Circuit reads these statutory powers broadly: "The language of § 105 encompasses 'any type of order, whether injunctive, compensatory or punitive,' as long as it is 'necessary or appropriate to carry out the provisions of' the Bankruptcy Code." In re Hardy, 97 F.3d at 1389

---

Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.), 92 F.3d 1539, 1553 n.13 (11th Cir. 1996) (citing In re Mroz, 65 F.3d at 1575) (internal citations omitted).

24

(quoting <u>In re Jove Eng'g, Inc.</u>, 92 F.3d at 1553-54); <u>see</u> <u>Alderwoods</u>, 682 F.3d at 966-67 ("In addition to the traditional sanctions for coercing compliance with an injunction— incarceration or financial penalty, . . . a bankruptcy court may issue orders to obviate conduct that stands to frustrate administration of the Bankruptcy Code . . . .") (internal citations omitted).

## II.

### Bankruptcy Courts Sanctioning Power Includes Authority to Incarcerate Contemnors for Civil Contempt.

Many courts interpret § 105 to grant bankruptcy courts the power to sanction civil, but not criminal, contempt. <u>See</u> <u>In re Hardy</u>, 97 F.3d at 1389. Although § 105 grants bankruptcy courts broad powers to enforce their orders, this authority is limited to actions necessary and appropriate for carrying out the provisions of the Code. <u>See</u> <u>Law v. Siegel</u>, 134 S. Ct. 1188, 1198 (2014) ("[B]ut whatever other sanctions a bankruptcy court may impose on a dishonest debtor, it may not contravene express provisions of the Bankruptcy Code. . . ."). Many courts have found that criminal contempt sanctions are not "necessary and appropriate" to carry out the provisions of the Bankruptcy Code. <u>See</u> <u>In re Hardy</u>, 97 F.3d at 1389; <u>but see</u> <u>In re WVF Acquisition, LLC</u>, 420 B.R. 902, 914 (Bankr. S.D. Fla. 2009) (quoting <u>Walton v.</u>

AO 72A
(Rev. 8/82)

Countrywide Home Loans, Inc., No. 08-23337, 2009 WL 1905035, at *8 (S.D. Fla. June 9, 2009)) ("So long as the criminal contempt sanction is necessary or appropriate, a bankruptcy court has the statutory power to impose criminal sanctions.").

The distinction between civil and criminal contempt is particularly important because "[c]riminal contempt is a crime in every fundamental respect." Bloom v. Ill., 391 U.S. 194, 201 (1968). Therefore, an order of punitive sanctions necessarily implicates the contemnor's criminal due process rights and the added procedural protections afforded under the Constitution. See Turner v. Rogers, 131 S. Ct. 2507, 2518 (2011) (noting criminal contempt, compared to civil contempt, affords criminal due process rights and additional procedural protections). An order of civil sanctions does not trigger the same due process rights and procedural protections. See Int'l Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 827 (1994)(neither a jury trial nor proof beyond a reasonable doubt is required for finding of civil contempt); Combs v. Ryan's Coal Co., 785 F.2d 970, 981 (11th Cir. 1986) (no guarantee of full due process despite seriousness of incarceration for civil contempt).

Whether a contempt proceeding is civil or criminal is determined by the purpose of the proposed sanctions. See In re Jove Eng'g, Inc., 92 F.2d at 1557-58. The purpose of civil contempt sanctions is to "(1) compensate the complainant for

losses and expenses it incurred because of the contemptuous act, and (2) coerce the contemnor into complying with the court order." Id. at 1557. In contrast, sanctions for criminal contempt are "punitive in nature and are imposed to vindicate the authority of the court." Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 423 (1986).

The test to determine whether a sanction for contempt is coercive and not punitive has been said to be "(1) whether the award directly serves the complainant rather than the public interest, and (2) whether the contemnor may control the extent of the award." In re Hardy, 97 F.3d at 1390. A sanction is punitive if it is defined by the court and may not be purged through any action of the contemnor. See In re Jove Eng'g, Inc., 92 F.3d at 1559.

The imposition of incarceration to sanction contempt is not limited to criminal contempt. See Int'l Union v. Bagwell, 512 U.S. at 827-829; Shillitani v. United States, 384 U.S. 364, 370 (1966). In International Union v. Bagwell, the United States Supreme Court made clear that an appropriately fashioned order of conditional incarceration for civil contempt will not implicate a contemnor's due process rights:

> **The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command** such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance.

Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of earlier release if he complies. **In these circumstances, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket.**

By contrast, a fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a completed act of disobedience, such that the contemnor cannot avoid or abbreviate the confinement through later compliance. . . . When a contempt involves the prior conduct of an isolated, prohibited act, the resulting sanction has no coercive effect. The defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. . . .

. . . A close analogy to coercive imprisonment is a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order. Like civil imprisonment, such fines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged.

512 U.S. at 827-829 (emphasis added) (internal quotations omitted).

A bankruptcy court may validly exercise its civil contempt power to order coercive incarceration sanctions so long as three conditions are satisfied.

First, the contemnor must always be able to purge the contempt through compliance. See Hicks ex rel. Feiock v. Feiock, 485 U.S. 624, 649 (1988) (finding respondent "carries something even better than the 'keys to the prison' in his own pocket: as long as he meets the conditions of his informal probation, he will never enter the jail."); Shillitani, 384 U.S. at 370 n.6 (finding a fixed two year sentence which included a purge clause

28

was a civil contempt sanction); In re Lawrence, 279 F.3d at 1300 (affirming bankruptcy court's order of imprisonment to coerce compliance with its turnover order when settlor of offshore asset protection trust retained de facto control over the trust and therefore held the keys to his prison in his pocket). Coercive sanctions are not available "when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." Hicks, 485 U.S. at 638 n.9.

Second, civil contempt sanctions imposed to coerce compliance with a court order "'cannot be any greater than necessary to ensure such compliance' and may not be so excessive as to be punitive in nature." In re Jove Eng'g, Inc., 92 F.3d at 1558 (quoting Citronelle-Mobile Gathering, Inc. v. Watkins, 943 F.2d 1297, 1304 (11th Cir. 1991)). This is a fine line to walk. Coercive incarceration is the most severe sanction available to bankruptcy courts; it therefore poses the highest risk of becoming punitive. See In re Duggan, 133 B.R. 671, 671-74 (Bankr. D. Mass. 1991). To mitigate this risk, incarceration sanctions should be ordered only after less severe alternatives have failed or have been deemed doomed to fail. See Combs, 785 F.2d at 981.

Finally, the contemnor's incarceration must remain coercive: "[W]hen civil contempt sanctions lose their coercive effect, they become punitive and violate the contemnor's due process rights." Commodity Futures Trading Comm'n v. Wellington

AO 72A
(Rev. 8/82)

Precious Metals, Inc., 950 F.2d 1525, 1530 (11th Cir. 1992); see Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 442 (1911). The Eleventh Circuit has upheld an order of incarceration, but cautioned "although incarceration for civil contempt may continue indefinitely, it cannot last forever." In re Lawrence, 279 F.3d at 1300 (quoting United States v. O.C. Jenkins, 760 F.2d 736, 740 (7th Cir. 1985)). A court ordering indefinite incarceration to enforce compliance must reconsider the incarceration at reasonable intervals to determine whether there remains a realistic possibility the contemnor will yield to the coercive effect of the sanction. See In re Lawrence, 279 F.3d at 1301 ("If the bankruptcy judge determines that, although Lawrence has the ability to turnover the Trust res, he will steadfastly refuse to do so, the judge will be obligated to release Lawrence because the subject incarceration would no longer serve the civil purpose of coercion.")

### III.

### Stern v. Marshall Has No Bearing on the Court's Authority to Sanction Contempt Through Incarceration

The United States Supreme Court held in Stern v. Marshall that "[t]he Bankruptcy Court below lacked the constitutional authority [under Article III] to enter a final judgment on a state law counterclaim that is not resolved in the

process of ruling on a creditor's proof of claim," notwithstanding that the proceeding was core under 28 U.S.C. § 157(b)(2)(C). 131 S. Ct. 2594, 2620 (2011).

As I have previously ruled, the holding in Stern only implicates the constitutional power of bankruptcy courts to enter final orders in matters addressing "counterclaims by the estate against persons filing claims against the estate," 28 U.S.C. § 157(b)(2)(C). See In re Matrix Imaging Servs. Inc., 479 B.R. 182, 192-93 (Bankr. S.D. Ga. 2012); see also In re Miles, 477 B.R. 266, 269 (Bankr. N.D. Ga. 2012)(Stern does not impact bankruptcy court's ability to enter a final judgment in any other type of core proceeding). The Court unequivocally stated that the question presented was "a narrow one" and that Congress exceeded the bounds of Article III "in one isolated respect." Stern, 131 S. Ct. at 2620; see In re Matrix, 479 B.R. at 192-93; see also In re Sundale, Ltd., 499 Fed App'x 887, 891 (11th Cir. 2012)(per curiam)(majority opinion in Stern "made clear that it did not intend its decision to have broad implications"). Unless and until the Supreme Court addresses other subsections, the balance of the authority granted to bankruptcy judges under § 157(b)(2) is constitutional. See id. (citing Badami v. Sears (In re AFY, Inc.), 461 B.R. 541, 547-48 (8th Cir. BAP 2012)).

Here, the Contempt Motion pertains to a debtor's failure to comply with an order of this court. (Contempt Mot.,

ECF No. 62.) The Contempt Motion does not involve a ruling on "counterclaims by the estate against persons filing claims against the estate." Id.; see Stern, 131 S. Ct. at 2620. As I discussed above, this proceeding is a core proceeding under provisions other than 28 U.S.C. § 157(b)(2)(C), namely 28 U.S.C. §§ 157(b)(2)(A) and (b)(2)(E). Since § 157(b)(2)(C) is not implicated, Stern does not call into question my authority to make a final ruling on the Contempt Motion.

Further, Stern cannot be interpreted broadly to limit the bankruptcy court's ability to sanction contempt through incarceration.[9] See In re Vaso Active Pharm., Inc., 514 B.R. 416, 426 (Bankr. D. Del. 2014) (Court did not identify any constitutional impediment to ordering incarceration for civil contempt) but see Bailey v. Hako-Med USA, Inc. (In re Bailey), No. 07-41381, A.P. No. 09-4002, 2011 WL 7702799 at *2 (Bankr. S.D. Ga. July 29, 2011) (stating it was unclear whether court has constitutional authority to impose non-monetary sanctions). Such an interpretation would be an unwarranted expansion of the Court's narrow ruling. Cf. Day v. Persels & Assocs., LLC, 729 F.3d 1309, 1323 (11th Cir. 2013) (declining to extend Stern to deem authority granted to magistrate judges under 28 U.S.C. § 636(c) unconstitutional); In re Extended Stay, Inc., 466 B.R.

---

[9] If the District Court rules otherwise, it may review my opinion de novo under the Supreme Court's recent ruling in Executive Benefits Ins. Agency v. Arkison. 134 S. Ct. 2165, 2174 (2014).

AO 72A
(Rev. 8/82)

188, 203 (S.D.N.Y. 2011) (refusing to expand effect of Stern and noting "[w]ithdrawing the reference simply due to the uncertainty caused by Stern is a drastic remedy that would hamper judicial efficiency").

Additionally, such an interpretation ignores the fact that the Court in Stern focused heavily on the lack of a connection between bankruptcy or other federal law and the state law counterclaim at issue. See 131 S. Ct. at 2618. In contrast, the Contempt Motion here arose out of Tate's failure to comply with the Turnover Order. Turnover of property of the estate is directly related to the bankruptcy case. 11 U.S.C. § 542. The Bankruptcy Code requires the Trustee determine what constitutes property of the estate and employ turnover orders, among other tools, to ensure proper administration of the bankruptcy estate. 11 U.S.C. § 704(a).

Finally, my request to the District Court to issue an arrest warrant does not imply a lack of authority to sanction contempt through incarceration. My request was a matter of logistics and efficiency, not evidence of an underlying lack of constitutional authority. See Sears, Roebuck & Co. v. Spivey, 265 B.R. 357, 372-73 (E.D.N.Y. 2001) (bankruptcy judges have discretion to set parameters and issue orders for the efficient dispensation of justice and equity).

AO 72A
(Rev. 8/82)

The issuance of an arrest warrant by the clerk is a ministerial act. See Bryan v. Congdon, 86 F. 221, 224 (8th Cir. 1898) (noting with regards to an arrest warrant that the clerk performs a perfunctory act whereas the judge has discretion to control the actual proceedings); see also United States v. Giwa, 617 F. Supp. 2d 1086, 1091 (D. Nev. 2007)(longstanding procedure in which judge enters order and clerk issues and signs arrest warrant is constitutional). Different courts have different procedures to request such acts. See e.g., In re Duggan, 133 B.R. at 674 (directly instructing U.S. Marshals through order to arrest contemnor). My request to the District Court simply acknowledges the fact that in the Southern District of Georgia, the only procedure available to effectuate an order of incarceration relies on the Clerk of the District Court—an office over which I do not have direct authority to issue the arrest warrant.

## IV.

### Tate Remains in Contempt of Court.

In the months since I issued the Incarceration Order, Tate has made no additional progress towards purging his contempt through fulfillment of the requirements of the Contempt Order. As stated in the Incarceration Order, Tate has fulfilled his

requirements under subsection "c" of the contempt order—turning over the Vehicle to the Trustee. (ECF No. 96 at 3.)

But he has not fulfilled any of his other obligations under the remaining subsections.

The Trustee, through his own efforts, has uncovered additional information about what happened to the Undocumented Funds after the Tates closed Account # xxx8589 on August 21, 2013. However, the Trustee's Bank Records do not establish the current whereabouts of the money.

And Tate continues to lie.

I previously found it particularly unworthy of belief that Tate had withdrawn $78,541.91 in cash, lived off the money for two months without creating any kind of verifiable record, then lost $58,958.91 while gambling. (ECF No. 86 at 15.) Tate has now admitted he lied. I find Tate's most recent testimony equally unworthy of belief.

Tate now asserts that out of the $78,541.91 in official checks purchased on August 21, 2013, he used $25,000.00 to repay a debt to an acquaintance, Byron Hall, and cashed the other checks intermittently between September 18, 2013, and January 6, 2014, to pay for "rent, car payment, [and] . . . daily living expenses" without creating any kind of verifiable records. (Hr'g Sept. 11, 2014, at 1:58:15–1:58:26.) Tate has provided me no reason to believe that his most recent testimony is more credible

AO 72A
(Rev. 8/82)

than his previous testimony, which he admitted was false. See SEC v. Huffman, 996 F.2d 800, 803 (5th Cir. 1993) (court is not bound to accept unsubstantiated, self-serving testimony as true); U.S. ex rel. Thom v. Jenkins, 760 F.2d 736, 740 (7th Cir. 1985) (testimony insufficient to meet burden when self-serving, self-contradictory, confusing, and uncorroborated).

Further, Tate offered no testimony or other evidence to explain contradictions previously noted concerning Exhibit D. (See generally Hr'g Sept. 11, 2014, at 1:43:25-2:31:28.) Accordingly, he has failed to provide a credible accounting as required under subsections "a" and "b" of the Contempt Order.

I previously found that Tate had taken some steps to comply with subsection "d" of the Contempt Order. (ECF No. 96 at 3.) However, I noted remaining omissions: "Tate did not list any of the amounts transferred and completely omitted information regarding some of the checks at issue." (Id.) The record establishes that Tate has failed to cure these deficiencies in satisfaction of subsection "d".

Finally, Tate did not present any evidence that he has made "all other efforts reasonably necessary to recover the property of the estate" as required by subsection "e" of the Contempt Order. Tate provided no evidence that he has attempted to recover the portion of the funds supposedly loaned to friends and relatives. See In re Lawrence, 279 F.3d at 1298 (discussing

CFTC, 950 F.2d at 1530); see also United States v. Hayes, 722 F.2d 723, 725-26 (11th Cir. 1984) (contemnor ordered to produce financial records did not make all reasonable efforts "merely by adducing evidence that he *requested* the documents (even diligent requests involving trips to Switzerland), when it appears that he [had] greater leverage at his disposal.").

Specifically, with regards to the $25,000.00 given to Byron Hall, Tate has provided little if any assistance in recovering these funds. (Hr'g Sept. 11, 2014, at 1:53:22-1:53:58.) His testimony best reflects the extent of his efforts and his attitude about getting the money returned to the Trustee:

> **Trustee:** Have you gone back to [Byron Hall] since all this came to light and tried to get $25,000 back?
>
> **Tate:** No sir.
>
> **Trustee:** I have. I've written him twice, certified letters. Did he tell you that?
>
> **Tate:** I've talked to him and he says he doesn't know you whatever. I don't want to say anything. . . . I just told him he may need to get in contact with you and do what he needs to do, but my debt with him, you know, is settled.

(Id.)

Tate's offer to voluntarily consent to a judgment and allow for garnishment of his wages does not constitute a reasonable effort. See Combs, 785 F.2d at 984; Hayes, 722 F.2d at 725-26. I first have to believe that Tate does not have the money or is not capable of further accounting for the money before I

AO 72A
(Rev. 8/82)

render a judgment authorizing garnishment. Based on the record in this case, the false testimony, and the slow dribble of facts concerning the Undocumented Funds, I cannot make such a finding. Judgment and garnishment are means to judicially establish a debt and provide a means through judicial process to collect that debt. This matter deals with the enforcement of an order of the court, not the collection of a debt. Accordingly, Tate's willingness to voluntarily consent to a judgment is immaterial.

## V.

### Compliance with the Turnover Order Remains Possible.

Tate has not presented any new evidence to show that compliance with the Contempt Order is impossible.

In the Contempt Order, I found that the Trustee established that Tate violated the accounting provision of the Turnover Order. (ECF No. 86.) Once a prima facie showing of a violation has been made, the burden of production shifts to the responding party, who may defend his failure on the grounds that compliance with the order was impossible. See CFTC 950 F.2d at 1529 (citing United States v. Rylander, 460 U.S. 752, 757 (1983) ("Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled, however, that in raising this defense, the defendant has a burden of production.")).

In order to succeed on the impossibility defense, the respondent must go "beyond a mere assertion of inability and establish that he has made in good faith all reasonable efforts to meet the terms of the court order he is seeking to avoid." CFTC, 950 F. 2d at 1529 (internal quotations omitted). The Eleventh Circuit strictly construes the "all reasonable efforts" requirement of the impossibility defense; substantial, diligent, or good faith efforts are not sufficient to rebut a prima facie showing of noncompliance. See In re Lawrence, 279 F.3d at 1297; Roberts, 858 F.2d at 701; Hayes, 722 F.2d at 725 (holding district court abused its discretion when it held an alleged contemnor showing "some effort" to comply with court order was sufficient to rebut moving party's prima facie case).

In the Contempt Order, I also found that Tate had failed to demonstrate that compliance with the Turnover Order was impossible. (ECF No. 86 at 14.) Since that time, Tate has presented no additional evidence to rebut this finding.

At some point, I may be forced to rule on whether there exists a real possibility that Tate will never comply with the Turnover Order. See CFTC, 950 F.2d at 1530 (discussing motions to terminate contempt orders). However, that question is not yet before me.

AO 72A

(Rev. 8/82)

## VI.

### Conditional Incarceration of Tate Is the Only Viable Sanction Remaining to Compel Compliance with the Turnover Order

The decision whether to impose sanctions is within the sound discretion of the trial court. See United Mine Workers, 330 U.S. at 303. Trial courts typically only consider the use of conditional incarceration as a contempt sanction once other methods to secure compliance have been considered. Combs, 785 F.2d at 981.

The imprecise boundary between civil and criminal contempt encourages caution and reluctance when considering an incarceration sanction. See Int'l Union v. Bagwell, 512 U.S. at 828 ("Most contempt sanctions, like most criminal punishments, to some extent punish a prior offense as well as coerce an offender's future obedience."); In re Lawrence, 279 F.3d at 1300 (cautioning lower courts that when civil contempt sanctions lose their coercive effect, they become punitive and violate the contemnor's due process rights).

The United States Supreme Court, noting the due process implication of incorrectly classifying a contempt proceeding as civil, has emphasized that the dividing line is the ability to comply:

> [T]he fact that ability to comply marks a dividing line between civil and criminal contempt reinforces the need for accuracy. That is because an incorrect decision (wrongly classifying the contempt proceeding as civil)

AO 72A
(Rev. 8/82)

can increase the risk of wrongful incarceration by depriving the defendant of the procedural protections (including counsel) that the Constitution would demand in a criminal proceeding.

Turner v. Rogers, 131 S. Ct. at 2518 (internal citations omitted).

In light of these considerations, I stated in the Contempt Order that Tate would be incarcerated only after less severe measures have failed to coerce his compliance. In turn, I imposed monetary sanctions on Tate in the Contempt Order. Those less severe sanctions failed to coerce his compliance. There is no reason to expect a different result from further monetary sanctions now. Further, other less severe sanctions are either no longer available or have similarly already failed. See Commercial Banking Co. v. Jones (In re Maxair Aircraft Corp. of Ga., Inc.), 148 B.R. 353, 359 (M.D. Ga. 1992)(coercive incarceration should be ordered when the contemnor has an established history of noncompliance and the circumstances indicate less severe sanctions would lack the force necessary to coerce compliance).

AO 72A
(Rev. 8/82)

## A. Less Severe Measures Are Either Unlikely to Have Any Coercive Effect, Are No Longer Available, or Have Already Failed.

First, imposing additional monetary sanctions on Tate is unlikely to have any coercive effect.[10] The Contempt Order already imposed a daily fine during the twenty-eight day period leading up to the Incarceration Order. (ECF No. 86, at 25-27.) Tate has not paid this fine. Further, this sanction did not coerce Tate's compliance with the Turnover Order. There is no reason to expect that Tate's response to further monetary sanctions would be any different. See In re Bailey, 2011 WL 7702799 at *1, *7-*9 (recommending incarceration when the respondent's contemptuous behavior rendered it impossible to determine both the amount of monetary sanctions necessary to coerce compliance and the amount that would be so excessive as to be punitive).

Second, some courts have considered using the threat, or the actual denial, of a discharge to coerce compliance with a turnover order. See In re Duggan, 133 B.R. at 672. But, like the bankruptcy court in In re Duggan, I have already revoked Tate's discharge by granting the Trustee's Motion to Revoke the

---

[10] Another bankruptcy court imposed a monetary sanction to specifically require payment of the chapter 7 trustee's counsel fees. In re GGW Brands, No. 2:13-bk-15130-SK, Docket No. 645 (Bankr. C.D. Cal. Aug. 4, 2014). Such a sanction is no different from a monetary sanction. Accordingly, I will not consider it separately as a coercive sanction.

Discharge under 11 U.S.C. §§ 727(d)(2) and (d)(3).[11] (ECF No. 81; ECF No. 102.) This sanction is no longer available.

Third, the threat of incarceration has already failed. The Contempt Order threatened imprisonment if Tate did not purge his contempt within twenty-eight days. (ECF No. 86 at 25-27.) Tate made only minimal progress toward purging his contempt during that period. (ECF No. 96 at 3.) More importantly, he failed to even appear as required by the Contempt Order at the hearing on April 30, 2014. The threat of incarceration did not coerce his compliance; rather, it encouraged his avoidance of this court's proceedings. In the ensuing months, the threat of incarceration has continued to hang over Tate to no effect. There is no reason to expect that Tate's response to the threat of incarceration will be any different over time.

Finally, garnishment is not a proper sanction. Garnishment is a proceeding through which creditors collect a debt; it is not a means to coerce compliance with an order. See Black's Law Dictionary 794 (10th ed. 2014). This court is not a creditor. Tate's failure to comply with the Turnover Order did not result in a monetary debt owed to this court. Tate owes this

---

[11] The bankruptcy court in In re Duggan also considered whether it could sanction the debtor by surcharging the debtor's exemption claim. The United States Supreme Court has since ruled that bankruptcy courts do not have the power to surcharge a debtor's exemptions for bad faith conduct. Law v. Siegel, 134 S. Ct. at 1196. Therefore, surcharging the debtor's exemption is not available to me as a coercive sanction.

court compliance. Garnishment of his wages will neither equate to nor excuse his compliance with the Turnover Order.

### B. Incarceration is the Only Alternative.

Given Tate's continued obstinance, and either the failure or unavailability of other sanctions, incarceration is the only alternative. See Granfinanciera, S.A. v. Nordberg (In re Chase & Sanborn Corp.), 872 F.2d 397, 401 (11th Cir. 1989) (quoting United Mine Workers, 330 U.S. at 701)(the court "must consider the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction bringing about the result desired.").

The coercive effect of incarceration is far stronger than the imposition of monetary sanctions or the denial of discharge. In re Duggan, 133 B.R. at 672. Tate has demonstrated through his failure to appear at hearings, lack of effort to obtain documentation supporting his testimony, and disrespect for this court's proceedings through inconsistent and perjurious testimony that less coercive sanctions affect neither his behavior nor his compliance with this court's orders. See In re Maxair, 148 B.R. at 359; see also In re Frankel, 192 B.R. 623, 632 (Bankr. S.D.N.Y. 1996)(concluding incarceration is the only appropriate sanction given debtor's exhibited behavior). Continuing to apply less coercive sanctions would reward Tate's

obstinacy without any benefit to the administration of the bankruptcy estate. See In re Frankel, 192 B.R. at 632.

**ORDER**

Tate's progress toward purging his contempt is insignificant and insufficient. He has had ample opportunity to comply with my orders, but has nevertheless repeatedly disregarded them. Tate remains in civil contempt of the Turnover Order.

**IT IS THEREFORE ORDERED** that Tate be incarcerated until he has purged his contempt through compliance with the Turnover Order. Accordingly, I renew my application to the United States District Court for the Southern District of Georgia for the issuance of an arrest warrant for Kipp Leshone Tate, directing the United States Marshal to use whatever force is reasonably necessary in order to arrest and restrain Tate at any hour of the day or night and on any day of the week. The Marshal Service is advised that Tate is a law enforcement officer and that all necessary precautions should be taken to ensure his safety during his incarceration; and

**FURTHER ORDERED** that upon execution of the arrest warrant, the Marshal Service shall notify chapter 7 trustee R. Michael Souther and the bankruptcy court of Tate's arrest. An

AO 72A
(Rev. 8/82)

expedited hearing will then be set to afford Tate an opportunity to address the remaining deficiencies in his compliance with the Turnover Order.

JOHN S. DALIS
United States Bankruptcy Judge

Dated at Brunswick, Georgia,
this 17 day of October, 2014.