IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA

Brunswick Division

**FILED**

**Lucinda B. Rauback, Clerk**
**United States Bankruptcy Court**
**Brunswick, Georgia**
**By jbergen at 11:47 am, Aug 21, 2015**

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| KIPP LESHONE TATE and | ) | CHAPTER 7 CASE |
| CAROLYN TATE | ) | NUMBER 12-20238 |
| | ) | |
| Debtors | ) | |
| _____ | ) | |
| | ) | |
| | ) | |
| R. MICHAEL SOUTHER, TRUSTEE | ) | |
| | ) | |
| Movant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| CAROLYN TATE | ) | |
| | ) | |
| Debtor/Respondent | ) | |

**OPINION AND ORDER GRANTING MOTION TO COMPEL TURNOVER AND ENTRY OF
MONEY JUDGMENT**

This matter is before me on the chapter 7 Trustee's Amended and Re-Cast Motion to Compel Debtor Carolyn Tate to Turnover Property of the Bankruptcy Estate ("Amended Turnover Motion"). I find that the Trustee has met the burden necessary to compel turnover of property of the estate that Mrs. Tate has failed to surrender. Further, I find that based on Mrs. Tate's evasive testimony and refusal to comply with her duty to turn over and

account for property of the estate in her possession, a money judgment for the value of that property is appropriate now.

## BACKGROUND

Carolyn Tate and her husband, Kipp Leshone Tate, filed for chapter 7 bankruptcy relief on February 27, 2012. (ECF No. 1.)[1] Schedule B of the Tates' bankruptcy petition lists an "Arbitration Claim Pending vs. D.C. Metropolitan Police Dept." as property of the estate, values the arbitration action at $280,000.00, and claims a $10,000.00 exemption in any award resulting from the arbitration action. (Sch. B of ECF No. 1, at 10.)

In June 2013, a decision on the arbitration action reinstated Mr. Tate to his former position with the D.C. Metropolitan Police and awarded him full back pay and other benefits for the period of February 18, 2006, to April 20, 2013. (Ex. A of ECF No. 192.)

On August 20, 2013, after being prompted by his Union Attorney, Mr. Tate called the Trustee's office to inform the Trustee that he had received a net payment from the arbitration action in late June ("Award Funds"). (ECF No. 192 ¶ 9.)

---

[1] References to the chapter 7 case docket appear in the following format: (ECF No. ___.)

AO 72A

(Rev. 8/82)

The next day, August 21, 2013, the Trustee filed a motion to compel Mr. Tate to turn over the Award Funds. (ECF No. 51.)

On September 12, 2013, I granted the Trustee's motion ("Turnover Order"). (ECF No. 56.) However, Mr. Tate failed to comply with the Turnover Order and the Trustee initiated contempt proceedings against him shortly thereafter on October 2, 2013 ("Contempt Proceedings"). (Mot. for Contempt, ECF No. 62.)

In November 2013, the Tates turned over $19,583.00 to the Trustee prior to a hearing held on November 7, 2013, in the Contempt Proceedings. However, Mr. Tate had not provided any explanation of where the remaining Award Funds were and was not present at the hearing to testify. I continued the hearing.

At the continued hearing on January 9, 2014, Mr. Tate testified regarding the disposition of the Award Funds not surrendered to the Trustee. He stated that he was no longer in possession of any of the Award Funds, claiming he had lost a significant amount gambling and spent the rest on daily living expenses. (Jan. 9, 2014, Hr'g Tr. at 5:25-7:13, ECF No. 83.)

On January 23, 2014, following the continued hearing, Mr. Tate and the Trustee submitted certain stipulations regarding the Award Funds. (ECF No. 76.) The stipulations included a document created by Mr. Tate purporting to show how the Award

3

AO 72A

(Rev. 8/82)

Funds were spent prior to August 21, 2013 ("First Accounting"). (Id. at Exs. D and E.) In the First Accounting, similar to his testimony, Mr. Tate claimed that all of the Award Funds not withdrawn on August 21, 2013, had been gambled away or spent on daily living expenses. (Id.) The stipulations also included copies of bank statements and cancelled checks written by Mr. and Mrs. Tate prior to this same date. (Id. at Exs. B and C.)

On January 27, 2014, presumably as a result of the information disclosed at the continued hearing and in the stipulations, the Trustee filed a motion to compel Mrs. Tate to turn over the Award Funds ("Turnover Motion"). An initial hearing was held on the Turnover Motion on March 13, 2014 ("Initial Turnover Hearing"). At the conclusion of the Initial Turnover Hearing, I took the Turnover Motion under advisement and ordered the parties to submit letter briefs. However, due to the ongoing contempt proceedings against Mr. Tate, the proceedings to compel Mrs. Tate to turn over the Award Funds were in effect stayed until June 2015.

In the meantime, the Trustee continued his efforts to coerce Mr. Tate's compliance with the Turnover Order. On March 28, 2014, I found Mr. Tate in contempt for his failure to comply with the Turnover Order. (ECF No. 86.) I gave Mr. Tate twenty-eight days to purge his contempt and imposed a daily fine of

4

AO 72A
(Rev. 8/82)

$100.00 per day until he did so. (Id. at 26-27.) Additionally, I stated that if Mr. Tate did not purge his contempt within twenty-eight days, I would order him incarcerated until he did so. (Id. at 27.)

After twenty-eight days, Mr. Tate had not purged his contempt. On April 30, 2014, I entered an order requesting that the District Court for the Southern District of Georgia ("District Court") issue an arrest warrant for Mr. Tate. (ECF No. 96.) Mr. Tate appealed my order. (ECF Nos. 97,99.)

On appeal, the District Court remanded the case for development of a more complete record. (ECF No. 117.) I held a continued hearing on September 11, 2014, for that purpose ("Remand Hearing").

Prior to the Remand Hearing, the Trustee received records from SunTrust Bank ("SunTrust") in response to a subpoena ("Trustee's Bank Records"). (Ex. A of ECF No. 85.) These records told a significantly different story from the one Mr. Tate told through his previous testimony and the First Accounting.

When confronted with the Trustee's Bank Records at the Remand Hearing, Mr. Tate admitted under oath that the First Accounting and his previous testimony were false. (Sept. 11, 2014, Hr'g Tr. at 16:12-17:6, ECF No. 139.) However, Mr. Tate did not explain what he actually did with the money aside from

5

claiming that it had all been used on "just daily living expenses." (Id. at 23:25-24:1.)

Following the Remand Hearing, I found that Mr. Tate remained in contempt and I renewed my request to the District Court for the issuance of an arrest warrant. Mr. Tate was arrested and spent three nights in jail before being released with a new deadline to submit a detailed accounting of how the Award Funds had been spent.

On March 12, 2015, I transmitted a record of both Mr. and Mrs. Tate's actions in this case to the United States Attorney for the Southern District of Georgia for the purpose of considering various criminal charges ("Criminal Referral").

Mr. Tate submitted the detailed accounting a month-and-a-half after the deadline I set. On April 15, 2015, after reviewing the detailed accounting, I found Mr. Tate remained in contempt and entered a judgment against him in favor of the Trustee. (ECF No. 170, at 13.) I specifically found that, in addition to being late, the detailed accounting submitted did not include any supporting documentation, did not include his income during the specified period, and did not account for all of the funds in question. (Id. at 7-8.)

Following the entry of a judgment against Mr. Tate, a continued hearing on the Turnover Motion ("Continued Hearing")

AO 72A
(Rev. 8/82)

was scheduled for June 8, 2015, to allow Mrs. Tate to address the evidence contained in the Trustee's Bank Records and Mr. Tate's admission that the First Accounting and his previous testimony were not true.

After the Continued Hearing, the Trustee filed a motion on June 10, 2015, requesting permission to amend the Turnover Motion. (ECF No. 163.) The Trustee sought to include a prayer that a judgment be entered against Mrs. Tate for the value of the Award Funds that are property of the estate. (Id.)

On June 15, 2015, notice was issued to all creditors and parties in interest establishing July 13, 2015, as the deadline for written objections to the Trustee's request for leave to amend the Turnover Motion. (ECF No. 185.) The notice stated that if no objections were received, an order granting leave to amend would be entered. No objections were received and an order was entered accordingly. (ECF No. 190.)

On July 22, 2015, the Trustee filed the Amended Turnover Motion. (ECF No. 192.) That same day, notice was issued to all creditors and parties in interest establishing August 19, 2015, as the deadline for written objection to the Amended Turnover Motion. (ECF No. 193.) The notice stated that if no timely objections were filed, an order granting the motion would be entered. No objections were filed.

AO 72A

(Rev. 8/82)

## FINDINGS OF FACT

On June 25, 2013, the Tates received the Award Funds, a net payment of $171,534.61. (ECF No. 192 ¶ 4.) The parties agree that $120,873.39 of the Award Funds—less the $10,000.00 exemption—constitutes property of the Tates' chapter 7 bankruptcy estate. (Id. at ¶ 5.) The remaining $50,661.22 constitutes postpetition earnings and benefits and is not subject to turnover. (Id.)

The same day the Tates received the Award Funds, $171,408.05 was deposited into two accounts at SunTrust: $31,408.05 in account # xxx8597 and $140,000.00 in account # xxx8589. (Initial Hr'g Exs. T2-T3, Mar. 13, 2014, ECF No. 113.) Mr. and Mrs. Tate jointly hold both these accounts. (Id.)

Between June 26, 2013, and August 15, 2013, Mrs. Tate wrote ten checks totaling $43,192.94 on both accounts. (Id. at T4-T13.) Mrs. Tate admitted that she wrote many of these checks for her own purposes, such as a gift for her mother and a security deposit for office space for a business she planned to open. (Id. at T8-T9, T11, ECF No. 113; Initial Hr'g Tr. 13:12-15:10, Mar. 13, 2014, ECF No. 129.)

On August 21, 2013, the same day the Trustee filed the motion to compel Mr. Tate to turn over the Award Funds, Mrs. Tate

closed account # xxx8589 and withdrew the entire remaining balance of $78,541.91. (Initial Hr'g Ex. T15, ECF No. 113.)

Mrs. Tate's testimony regarding the closing of this account at the Initial Turnover Hearing was evasive and incredible. First, she could not recall whether she received cash or a cashier's check when she closed the account:

> **Trustee:** What did you do with the money?
>
> **Mrs. Tate:** I gave it to him.
>
> **Trustee:** You got cash?
>
> **Mrs. Tate:** I got a cashier's check I believe. I believe. I'm not sure. I can't recall.
>
> **Trustee:** Well, let's think about it. It was just in August. You got seventy eight thousand five hundred and something dollars. Did you get cash; did you get a cashier's check; what did you get?
>
> **Mrs. Tate:** I'm not sure. I can't recall.
>
> **Court:** Let me ask something. . . . Are you used to carrying around $78,000 in cash?
>
> **Mrs. Tate:** No, sir. No, sir.
>
> **Court:** Think hard. Did you get cash or did you get a cashier's check?
>
> **Mrs. Tate:** It could have been both. I'm not sure. It could have been both. I'm not sure. My memory is bad. In November I had a concussion so a lot of things are just not clear.

(Initial Hr'g Tr. 22:4-22:24, ECF No. 129.)

Mrs. Tate also testified that she did not know what Mr. Tate did with the money after she gave it to him:

AO 72A

(Rev. 8/82)

**Trustee:** You turned the money over to your husband, is that what you're telling us?

**Mrs. Tate:** Yes, sir.

. . .

**Trustee:** All right. What did he do with the money?

**Mrs. Tate:** That I don't know.

**Trustee:** You have no idea?

**Mrs. Tate:** I know he frequented the casinos.

. . .

**Trustee:** He never discussed it with you?

**Mrs. Tate:** No.

(Id. at 23:5-24:4.)

Mrs. Tate admitted that she later returned to the bank at Mr. Tate's instruction to get cashier's checks to turn over $19,583.00 to the Trustee.[2] (Id. at 27:13-14.) However, she testified that she did not know where the money she used to get the cashier's checks came from:

> **Trustee:** After I filed the motion to compel turnover against Mr. Tate, you and him were able to come up with $19,583. Two different checks were written to me. I think they came from you. Where did that money come from?
>
> **Mrs. Tate:** Money that he had.

---

[2] The Trustee's Interim Report from January 21, 2014, shows receipt of two checks on November 7, 2013: one from Mrs. Tate for $10,000.00 and one from Mr. Tate for $9,583.00. (ECF No. 75 at 3.) There has been no explanation as to where the check from Mr. Tate came from.

AO 72A

(Rev. 8/82)

. . .

**Trustee:** Where? These two accounts were depleted. Did you have it under the bed or where did you have it?

**Mrs. Tate:** I don't know where he had it. I mean, it was just money that he had. Like I said, I gave it to him.

**Trustee:** It was in the dresser drawer; where?

**Mrs. Tate:** I don't know, sir.

**Trustee:** You got checks for it though, right?

**Mrs. Tate:** Yes.

**Trustee:** How did it come to pass? How did he give you the money? Did he give you dollar bills, what did he give you?

**Mrs. Tate:** He probably gave me dollar bills; cash.

**Trustee:** Probably?

**Mrs. Tate:** Yes.

. . .

**Trustee:** Other than coming from him, you don't know where he got it from?

**Mrs. Tate:** I am assuming it was the money that I gave him originally when I closed the account.

**Trustee:** Did he write you a check or did he give you cash?

**Mrs. Tate:** Again, I don't recall. I just know that I went to the bank and got a cashier's check.

(Id. at 26:5-27:14.)

  The Trustee's Bank Records provide definitive evidence of what happened after Mrs. Tate withdrew the funds. They show

AO 72A
(Rev. 8/82)

that eight official checks totaling $70,541.91 were drawn from account # xxx8589 on August 21, 2013, when the account was closed ("Checks 1-8"). (ECF No. 127 at 3-18.)

Check 1 was written for $25,000.00 to the order of "Byron Hall" and lists "Kipp L. Tate" as the "Purchaser."[3] (Id. at 3.) Checks 2-8 were written to the order of "Carolyn Davis" and list "Carolyn Davis" as the "Purchaser." (Id. at 7-18.) Carolyn Davis was Mrs. Tate's name prior to marrying Mr. Tate. (ECF No. 1 at 1.)

Check 6 was reissued on October 30, 2013, in the amount of $10,000.00 to the order of "R. Michael Souther, P.C.," the Trustee.[4] (ECF No. 127 at 15-16.) The Trustee's Bank Records show that the other checks were cashed as follows:

| Check | Amount | Date Cashed |
|---|---|---|
| Check 2 | $5,000.00 | September 30, 2013 |
| Check 3 | $5,000.00 | October 29, 2013 |
| Check 4 | $5,000.00 | December 5, 2013 |
| Check 5 | $5,000.00 | January 6, 2014 |
| Check 7 | $10,000.00 | November 6, 2013 |
| Check 8 | $5,541.91 | September 18, 2013 |

(Id. at 7-18.)

---

[3] According to the records, Byron Hall deposited Check 1, less $2,500.00, on the same day it was issued into a fourth SunTrust account—account # xxx8385. The Trustee initiated an adversary proceeding against Hall to recover the proceeds of Check 1. (A.P. No. 14-02023.) I entered a Judgment by Default in that case on February 23, 2014. (A.P., ECF No. 15.)

[4] It is not clear where the remaining $9,583.00 that was turned over to the Trustee came from. The Trustee did not have a copy of that check at hearing.

AO 72A

(Rev. 8/82)

The Trustee's Bank Records do not account for $8,000.00 that was in account # xxx8589 on the day it was closed.

At the Continued Hearing, I afforded Mrs. Tate the opportunity to account for the discrepancies between her testimony, the Trustee's Bank Records, and Mr. Tate's testimony on September 11, 2014. At the advice of counsel and as a result of the Criminal Referral, Mrs. Tate exercised her Fifth Amendment right not to testify.

However, prior to the hearing, Mrs. Tate submitted a "Statement of Accounting of $43,541.91 from 8/21/2013 thru 1/31/2014" ("Statement of Accounting").[5] (ECF No. 186.) The Statement of Accounting includes roughly $18,000.00 in detailed spending and $17,000.00 in total monthly expenses, e.g., rent, utilities, etc. It also includes copies of Mr. Tate's pay stubs totaling approximately $24,000.00 in take-home pay and an estimate that Mrs. Tate made approximately $600.00 doing "minor sporadic interior painting for clients" during this same period.

To date, the Tates have turned over property totaling $27,262.48 in value. This includes the $19,583.00 in cash and a 2007 Ford Explorer Sport Trac the Tates purchased using the Award

---

[5] Despite its title, the Statement of Accounting actually includes expenses from January 22, 2013 thru January 31, 2014. However, my analysis of the Statement of Accounting is limited to the stated period, which relates to the time immediately after account # xxx8589 was closed on August 21, 2013.

13

Funds, which the Trustee sold for a net total of $7,679.48 after related expenses.

## CONCLUSIONS OF LAW

### I.

### <u>Mrs. Tate is Compelled to Turn Over the Award Funds or the Value of the Award Funds that Are Property of the Estate.</u>

Debtors in bankruptcy are required to surrender all non-exempt property of the estate to the trustee and to generally cooperate with the trustee in order to gain the benefits of the bankruptcy laws. 11 U.S.C. § 521(a)(3); <u>Burnes v. Pemco Aeroplex, Inc.</u>, 291 F.3d 1282, 1289 (11th Cir. 2002).

With certain exceptions not applicable here, "an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a). Generally, the party requesting turnover under § 542 bears the burden of proof. <u>In re Lamar</u>, 249 B.R. 822, 824-25 (Bankr. S.D. Ga. 2000).

There is no dispute that $110,873.39 of the Award Funds is property of the estate that the Trustee may use, sell or lease. Additionally, there has been no assertion that the

14

estate's portion of the Award Funds is "of inconsequential value or benefit to the estate." See In re Burgio, 441 B.R. 218, 220 (Bankr. W.D.N.Y. 2010) (Debtor has burden to raise inconsequential value of property as affirmative defense).

Therefore, the Trustee must only prove that Mrs. Tate had possession of property of the estate "during the case." See 11 U.S.C. § 542(a); see also Beaman v. Vandeventer Black, LLP (In re Shearin), 224 F.3d 353, 356-57 (4th Cir. 2000) ("during the case" refers to the entire bankruptcy case, not just the turnover proceeding); Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. (In re USA Diversified Prods., Inc.), 100 F.3d 53, 56 (7th Cir. 1996) (requiring delivery of the value of estate property when debtor no longer has possession at time of turnover proceeding); Bailey v. Suhar (In re Bailey), 380 B.R. 486, 491-93 (B.A.P. 6th Cir. 2008) (trustee must only establish that an entity held estate property at some point during pendency of the bankruptcy case); In re Newman, 487 B.R. 193, 202 (B.A.P. 9th Cir. 2013) (same); Jubber v. Ruiz (In re Ruiz), 455 B.R. 745, 750 (B.A.P. 10th Cir. 2011) (same). But see Brown v. Pyatt (In re Pyatt), 486 F.3d 423, 429 (8th Cir. 2007) (trustee could not compel Debtor to turn over property no longer within Debtor's control).

AO 72A
(Rev. 8/82)

The Trustee has met this burden. First, the Trustee established that on June 25, 2013, the Award Funds were deposited into two SunTrust accounts. (Hr'g Ex. T2 and T3, ECF No. 113.) Bank statements indicate that these accounts were jointly held by Mr. and Mrs. Tate. (Id.) Accordingly, Mrs. Tate had possession of the Arbitration Award on June 25, 2013. See Shaw v. Shaw, 720 S.E.2d 614, 615-16 (Ga. 2012) (under Georgia law, placement of funds in joint bank account implies each spouse has an undivided one-half interest in the property).

Second, the Trustee established that Mrs. Tate continued to have possession of the Award Funds throughout the case. After the Tates received the Award Funds, Mrs. Tate drew ten checks on the two jointly held SunTrust accounts. (Hr'g Ex. T4-T13, ECF No. 113.) Additionally, upon closing account # xxx8589, Mrs. Tate obtained seven official checks written to the order of "Carolyn Davis," her maiden name. (ECF No. 127, 7-18 (listing "Carolyn Davis" as the "Purchaser").) Mrs. Tate then endorsed and cashed six of those official checks between September 18, 2013, and January 6, 2014, and instructed the bank to reissue the seventh to the order of "R. Michael Souther," the Trustee. (Id.)

Mrs. Tate's testimony that after closing account # xxx8589 she turned the money over to her husband and never saw

16

it again until he asked her to reissue one of the checks to the Trustee is not credible. Regardless, such testimony is irrelevant given the Trustee's evidence that she had possession of the Award Funds at multiple times throughout the case. Accordingly, I find that Mrs. Tate was in possession of the Award Funds during the case and is compelled to turn over the portion of the Awards Funds or the value thereof that is property of the estate.

## II.

### A Money Judgment Against Mrs. Tate in Favor of the Bankruptcy Estate Is Appropriate Now.

The Bankruptcy Code requires an entity in possession of property of the bankruptcy estate to "deliver to the trustee, and account for, such property *or the value of such property*." 11 U.S.C. § 542 (emphasis added); see In re White, 389 B.R. 693, 699 (B.A.P. 9th Cir. 2008) (affirming bankruptcy court's turnover order and money judgment for cash proceeds the debtor received that became property of the estate); In re Forbes, 58 B.R. 706, 707 (Bankr. S.D. Fla. 1986) (issuing money judgment in favor of trustee for proceeds of settlement that debtor refused to turn over).

Early on in Mr. Tate's Contempt Proceedings, I found that it was not appropriate to enter a money judgment in lieu of immediate turnover of the property itself, i.e., the money.

However, after a year-and-a-half of attempting to coerce Mr. Tate's compliance without producing much tangible benefit for creditors, I determined that a money judgment was appropriate.

To avoid repeating the same path with Mrs. Tate, the Trustee amended the Turnover Motion to include a request for a money judgment. I find that Mrs. Tate's failure to sufficiently account for the Award Funds to date and her evasive testimony make entry of a money judgment appropriate now.

First, Mrs. Tate has not fully accounted for the Award Funds. She has only provided two partial accountings: (1) her testimony at the Initial Turnover Hearing; and (2) the Statement of Accounting. In total, these two accountings only purport to show how less than half of the Award Funds were spent. Mrs. Tate is required to account for the entire amount of the Award Funds.[6]

Additionally, Mrs. Tate's partial accountings are incomplete and inconsistent. Mrs. Tate's testimony at the Initial Turnover Hearing addressed only $43,192.94 she spent before August 21, 2013. Similarly, the Statement of Accounting only accounted for approximately $35,000.00 in spending after August 21, 2013.

---

[6] In fact, Mrs. Tate would need to show spending equal to the amount of the Award Funds and the amount of income the Tates have had since receiving the Award Funds in order to demonstrate an inability to comply with her obligation to surrender the portion of the Award Funds that is property of the estate.

AO 72A

(Rev. 8/82)

Neither of these accountings provided the level of detail necessary. A full accounting requires supporting documentation and information, such as the full name and address of each transferee. (See Statement of Financial Affairs, ECF No. 1, at 41 (requesting name and address for recipients of all gifts made within one year preceding the case).)

Although Mrs. Tate explained through testimony whom she contends she transferred funds to before August 21, 2013, her explanation is unverifiable and was often dubious as to details. In many cases, Mrs. Tate was unable to make definitive statements regarding the disposition of the funds. She qualified many of her explanations with, for example, "I believe" and "probably." (Initial Hr'g Tr. 10:21, 12:24-25, 16:22-23, ECF No. 129.)

Additionally, four of the ten checks that Mrs. Tate's testimony attempted to account for were written to "Cash." (See Initial Hr'g Exs. T4-T7, ECF No. 113.) While she provided an explanation based on the notes in the memo lines on these checks, she did not present any evidence or means to verify that the memos or her explanation under oath were the actual disposition of the funds. In one instance, Mrs. Tate admitted that the note "Michael" written on the memo line of a check written to "cash" was not entirely accurate:

**Trustee**: So you gave [Michael] $6000 on June 29th?

AO 72A

(Rev. 8/82)

**Tate:** No. I didn't give him six thousand.

**Trustee:** What did you do?

**Tate:** I gave him three thousand.

**Trustee:** And the other three thousand, what did you do with that?

**Tate:** That went to my husband.

**Trustee:** It went to Mr. Tate?

**Tate:** Yes.

(Initial Hr'g Tr. at 9:23-10:5, ECF No. 129.)

While the Statement of Accounting is more detailed than Mrs. Tate's testimony, it provides no supporting documentation. Additionally, its credibility is called into question by its omission of an expense of $9,583.00 for the money the Tates turned over to the Trustee during the period it purports to cover.

Second, Mrs. Tate's testimony generally lacked credibility. Her testimony was evasive. In one instance, she was able to remember how she distributed cash and for what specific purpose the recipient used the cash, but in the next, she was unable to remember something as basic as whether she received large sums of money in cash or by check. (See generally Initial Hr'g Tr., ECF No. 129.)

Similarly, I find her plea of ignorance with regards to the whereabouts and use of the funds after August 21, 2013,

AO 72A

(Rev. 8/82)

untruthful. It is clear from the evidence and Mrs. Tate's own admissions that she used the Award Funds as if they were her own money prior to August 21, 2013. Nothing suggests that her treatment of the Awards Funds after that date was any different. To the contrary, the fact that Checks 2-8 were written to the order of her maiden name suggests she continued to use the Award Funds as her own.

Her plea of ignorance is also irrelevant. Mrs. Tate is a joint debtor in this case. Neither pretending to have buried her head in the sand nor pointing a finger at Mr. Tate relieves her of her duties under the Bankruptcy Code.

Based on Mrs. Tate's demonstrated unwillingness to cooperate throughout these proceedings, it seems unlikely that an order compelling her to turn over the Award Funds will be sufficient to coerce her compliance with the Trustee's request. The entry of a judgment now, will expedite the Trustee's ability to explore other avenues to recover the remaining portion of the Award Funds for the benefit of creditors.

Out of the full Arbitration Award, $110,873.39 is non-exempt property of the bankruptcy estate. To date, the Tates have turned over $19,583.00 in cash and a 2007 Ford Explorer Sport Trac ("Vehicle") to the Trustee. The Trustee recently sold the Vehicle, netting $7,679.48 for the benefit of the estate. The

21

Tates still owe the bankruptcy estate $83,610.91. It is appropriate to enter a judgment in that amount now.

### ORDER

The Trustee's Amended and Re-Cast Motion to Compel Debtor Carolyn Tate to Turnover Property of the Bankruptcy Estate is therefore **ORDERED GRANTED**; and

**FURTHER ORDERED** that Carolyn Tate immediately turnover to the Trustee $83,610.91, representing the interest of the bankruptcy estate in the Award Funds that has not been surrendered to date; and

**FURTHER ORDERED** that a money judgment against Carolyn Tate is appropriate now and will be entered in the principal amount of $83,610.91, together with future interest at the rate of 0.39% per annum from this date.

JOHN S. DALIS
United States Bankruptcy Judge

Dated at Brunswick, Georgia,
this 21 day of August, 2015.

AO 72A
(Rev. 8/82)